470 So.2d 1060 (1984)
AETNA LIFE INSURANCE COMPANY
v.
Margaret W. LAVOIE and Roger J. Lavoie, Sr.
82-426, 82-1152.
Supreme Court of Alabama.
December 7, 1984.
Motion for Disqualification, Withdrawal of Opinion and Hearing Denied March 8, 1985.
Rehearing Denied March 8, 1985.
*1061 Peter V. Sintz and William M. Cunningham, Jr. and Mary Beth Mantiply of Sintz, Pike, Campbell & Duke, Mobile, for appellant.
Joseph M. Brown, Jr. of Cunningham, Bounds, Yance, Crowder & Brown, Mobile, for appellees.
Motion for Disqualification, Withdrawal of Opinion and Hearing De Novo Denied March 8, 1985.
PER CURIAM.
These cases, involving a claim of bad faith refusal to pay an insurance claim, have been before this court on two previous occasions. Lavoie v. Aetna Life & Casualty Co., Inc., 374 So.2d 310 (Ala. 1979); Lavoie v. Aetna Life & Casualty Co., Inc., 405 So.2d 17 (Ala.1981). On the first appeal, we reversed the trial court's granting of the defendant/insurer's motion to dismiss for failure to state a claim. On the second appeal, we reversed the trial court's summary judgment for the defendant on two bad faith refusal to pay counts and summary judgment for the plaintiff on the contract counts.
In the instant cases, the insurer "admit[ted]" at the close of the plaintiff's evidence that the plaintiff had "made out a prima facie case to recover" on the contract of insurance, but moved for a directed verdict on the bad faith counts. The trial court denied the motion. The case went to the jury on two counts of bad faith refusal to pay, and on the contract claim. The jury was out for fifty minutes and returned a verdict for the plaintiffs in the sum of $3,501,650.22, of which sum $3,500,000 was for punitive damages. The defendant filed motions for judgment notwithstanding the verdict, or in the alternative, remittitur, or in the alternative, for a new trial. The trial judge denied the motions. The question presented on this appeal is whether the evidence presented a jury question on the tort of bad faith refusal to pay an insurance claim.

THE EVIDENCE
The plaintiffs, Margaret and Roger Lavoie, are husband and wife. Mrs. Lavoie was insured as a dependent under a group policy of health and medical insurance issued by the defendant, Aetna Life Insurance Company (hereinafter Aetna). Mr. Lavoie had been a policeman for the City of Mobile, but was retired on disability because of a brain tumor. The plaintiffs lived approximately forty miles from Mobile at the time this claim arose.
Mrs. Lavoie was examined by John B. Douglas, M.D., at his office on or around 31 January 1977. Mrs. Lavoie had telephoned Dr. Douglas and requested the examination. Upon her arrival at his office, Dr. Douglas arranged for Mrs. Lavoie to *1062 proceed directly to an examination room, rather than waiting, as was customary. Dr. Douglas testified this was done because of his concern over the symptoms Mrs. Lavoie had related to him in the telephone conversation. After an examination of Mrs. Lavoie, Dr. Douglas recommended to both Mr. and Mrs. Lavoie that Mrs. Lavoie be admitted to the Mobile Infirmary Hospital. The hospital was "full" so arrangements were made for admission when a room came available. Mrs. Lavoie was admitted to the hospital on 3 February 1977.
On the day of admission, Dr. Douglas dictated a "History and Physical Summary." In pertinent part this summary reads:
"This 54 year old lady has been followed in the past for mechanical low back pain and osteoarthritis. She had not been seen in our office in about 3 years. She came in with the interval history that she had been retired for 2 years, that her arthritis had become more active over the last several months and she was having generalized arthritis pains in her back, neck and all extremities particularly in the hips, left knee and around the pelvic area. She complains of being very nervous. She said that she has been noticing some intermittent bleeding from the bowel and has a past history of diagnosis of chronic ulcerative colitis. Because of the general exacerbation of her arthritis and the apparent exacerbation of her ulcerative colitis, she is admitted at this time for evaluation and treatment.
"PAST HISTORY: She had gall bladder surgery in 1970, a fibroid tumor removed in 1946 and an exploratory laparotomy in 1953. She has a history of a couple episodes of pnemonia [sic] but denies history of peptic ulcer, hepatitis, rheumatic fever, diabetes or hypertension, she has a questionable history of glaucoma, does not know the severe state of it. She has had episodes of chest pain in the past, about 4 years ago, none recently. No diagnosis or EKG's were done at the time of the pain.
"FAMILY HISTORY: Positive for hypertension and she has a brother who had 1 episode of what was called inflammatory arthritis as a child. No family history of cancer, diabetes or early heart disease."
Mrs. Lavoie was in the hospital a total of twenty-three days. During this period, Dr. Douglas, or his partner, ordered medical diagnostic tests to be completed on Mrs. Lavoie; an electroencephelogram (EEG), and electrocardiogram (EKG), a gastrointestinal series (GI series), a barium enema, a computer assisted tomogram (CAT scan) and various other tests. During her stay in the hospital, Mrs. Lavoie complained of headaches, dizziness, diarrhea, nervousness, problems with her family, blood in her stools, pain in her abdomen, joint pain, and shortness of breath. The evidence shows that Aetna had knowledge of these complaints before it finally denied the claim.
Dr. Douglas dictated a "discharge summary," after Mrs. Lavoie's discharge on 26 February 1977, which reads in full:
"54-year-old white female who was admitted with an abdominal pain, osteoarthritis and mechancial low back pain. She had not been seen in my office for three years when she came in because of general aching and particularly saying that she had had intermittent bleeding from the bowel and had a past diagnosis of chronic ulcerative colitis. We are unable to substantiate this diagnosis in the hospital. In fact, she had a negative GI workup. Her musculoskeletal complaints while she does have some normal amount of osteoarthritis varying from place to place for her age, it is not really outstanding and her general situation suggests that she considerable [sic] psychogenic overlay to her somatic symptoms, and therefore, they are somewhat exaggerated. She has been placed on Mellaril in depth. She has shown some suggestion of slight improvement in the hospital but continues to somaticize her symptoms rather vigorously. It has been explained to her that this is primarily a nervous problem and we have mentioned *1063 that she may need the help of a psychiatrist if she does not continue to improve following discharge.
"DISCHARGE DIAGNOSIS: OSTEOARTHRITIS, MILD PSYCHOPHYSIOLOGIC REACTION MANIFESTED BY ABDOMINAL PAIN."
On 3 March 1977, the hospital completed the appropriate forms and forwarded them along with the two summaries, the physician's progress notes and various other data such as the consultation on the EKG, to the Aetna office in Mobile. Included was a bill for $3,028.25. The supervisor of the Mobile office of the insurer, Alice Murphy, sent a request to the hospital for further information on 24 March 1977. This letter in pertinent part read:
"It would be greatly appreciated if you would send complete hospital records including, admitting and discharge summary, nurses and physicians notes."
On 5 April 1977, before receiving anything further from the hospital, Brenda Harris, a claim worker for Aetna, forwarded the information she had from the hospital to Jean Becker, a "Senior Claims Examiner," in Aetna's office in Hartford, Connecticut. To the information forwarded, Harris appended a memorandum stating:
"In our opinion a 23-day confinement for the diagnosis was not necessary. Hospital records do not indicate anything to the contrary."
In pertinent part, Aetna's response reads:
"DATE: April 27, 1977
"...
"This file has been reviewed with a member of the Medical Dept. On the basis of the limited information submitted, this confinement does not appear to have been medically necessary. We feel this patient could have been evaluated and treated on an out-patient basis.
"Several of the X-ray and lab procedures performed are not usual and customary for the diagnsois given. These include the CAT scan, EEG and EKG. Since the City of Mobile policy clearly limits coverage to services and supplies which are reasonably necessary for the diagnosis and treatment of nonoccupational disease or injury, room and board charges as well as the aforementioned miscellaneous charges must be denied. Thank you."
The Lavoies received notification, by a letter from Harris, on 3 June 1977, which reads in full:
"After having this file reviewed by our Medical Department we must, at this time, deny benefits for room and board charges.
"From the information we submitted to them it appears the evaluation and test could have been performed on an out-patient basis. Also, we must deny charges for the CT Brain Scan, EEG and EKG since they are not usual and customary procedures for the diagnosis given.
"If you have any questions please feel free to contact this office."
The defendant then paid $1,057.20 to the hospital for the medical diagnostic tests, other than the EEG, EKG, and CAT scan, and did not pay for physical therapy and a back brace. Dr. Douglas was paid $305.20 and the Lavoies were paid $217.34 directly. The parties stipulated the remainder on the claim was $1,650.22.
On 4 November 1977, Dr. Douglas wrote a very detailed medical report to Thomas J. Stein, Mrs. Lavoie's attorney at the time: It reads:
"Mrs. Lavoie was first seen here in 1973 and we continued seeing her on a regular basis for several months until January of 1974. At that time she had complaints of `muscular rheumatism.' She was concerned about severe medical illnesses such as muscular distrophy and multiple sclerosis because of her muscular pains. She was reassured that her problem was nothing of that nature.
"Her past history at that time was that three years previously she had been given the diagnosis of chronic ulcerative colitis. She was not under treatment for this when I saw her and was not having any problems as regards this. I thought *1064 she had a mechanical low back pain and a chronic anxiety syndrome.
"She disappeared from follow-up on January 3, 1974 and did not return until January 3, 1977. At that time she told me she had been retired for two years; and her arthritis was bothering her all over. It was in her hips, her left knee, her pelvis, and she was also very nervous. She reported having had bright red bleeding from the bowels. She was quite anxious, seemed to have flight of ideation, and changes in personality which I had not noted when I had seen her previously.
"Because of this she was admitted to the hospital for studies which were appropriate for personality change. These included CT Brain Scan, and EEG. All tests were negative and we felt that this was a rather severe anxiety syndrome and with the negative general workup felt that she was having a psychophysiologic reaction manifested by abdominal pain and anxiety.
"I believe that this summary shows that the workup which was done was appropriate in ruling out organic and abdominal disease and also organic intracranial disease. I hope this clears the matter to your satisfaction."
This letter was introduced into evidence. There was an unsigned notation on the letter from Dr. Douglas, which Harris testified she had made after a telephone conversation with Tom Hutton, a senior claims examiner in the Hartford, Connecticut office. The notation reads:
"11/9 Called Tom Hutton HO [home office] he said maintain denialif they act like they are going to file suit send back to him."
Harris further testified that she had read Dr. Douglas's letter to Hutton over the telephone and that the notation was an indication of Hutton's decision. Harris testified, as did Hutton, that no one else in the Connecticut office reviewed the letter from Dr. Douglas.
On 14 November 1977, Harris, by letter to the Lavoies' attorney, again denied the remainder of the claim.
"Thank you for the copy of the letter sent to you November 4, 1977, by Dr. Douglas since we had tried unsuccessfully on several occasions to get a letter from him. However, Dr. Douglas does not give us any information in his letter that we did not have in our copies of the hospital records. He does not state why the test had to be done as an inpatient nor why a 23 day hospital confinement was necessary. The test on the hospital order sheets were tests that could have been done as an outpatient. The doctor, in his letter and in his hospital records, does not give any indication as to why he could not have done the test as an outpatient.
"Without some further information from the Doctor as to why hospital confinement was medically necessary, we must maintain our denial."
The Lavoies' attorney then had Dr. Douglas write another letter and forwarded it to Harris. This letter read:
"I don't know of anything further I can say to establish that inpatient care was necessary for the testing and treatment of Mrs. Lavoie. Let me again point out the personality change in Mrs. Lavoie. In my best judgment she needed the controlled atmosphere of the hospital for observation and to carry out necessary testing."
An unsigned notation on the second letter read:
"12/20 Called Tom Hutton. He stated continue to deny claim on info available to us"
Harris testified this was her handwriting and was an indication of a telephone call she made to Hutton in the Hartford office. She testified she had read Dr. Douglas's second letter to Hutton, after which he again instructed her to deny the claim. Mrs. Harris wrote to the Lavoies' attorney on 23 December 1977, informing them of the denial:

*1065 "Thank you for your letter of December 19, 1977, with its attachment.
"I have again checked with our Medical Department on this matter and they have advised that, based on the information available to us, we must continue to deny any benefits for the room and board.
"If there is any additional information which might alter our decision, we would be most happy to consider it."
On 8 April 1978, Aetna's Mobile office wrote to the Mobile Infirmary requesting the nurse's notes which were then mailed to the Mobile office of Aetna. In turn, these nurses' notes were forwarded to R.E. Mann, a senior claims examiner in Hartford, who placed them with the admission and discharge summaries, physician's progress notes and physician's orders. He sent them to Aetna's Doctor Swan of the Medical Department, accompanied by his notation:
"(D) We now have nursing notes, which we did not have for the original review.
"Question: Should we change our original decision, based on the nurse's notes?
"Opinion: No. The nurse's notes do not indicate that in-patient confinement was medically necessary.
"R.E. Mann"
The two letters from Dr. Douglas were not in the file reviewed by Dr. Swan.
On 28 July 1978, Mann informed the Mobile office of another denial:
"[I]n response to your memo dated July 10, 1978, forwarded to Tom Hutton about the above claimant....
"Opinion
"We should maintain our original claims determination for the charges incurred by Mrs. Lavoie related to her confinement and services of Feb. 3 through Feb. 25, 1977.
"Rationale
"Our Home office Medical Staff has again reviewed this claim including the nurse's notes. They advise that in their opinion, in-patient confinment was not indicated for the claimant's wife's condition. The necessary test and evaluations could have been performed on an out-patient basis.
"Suggested Course of action
"Please advise the claimant with a copy to his attorney that his claimant has been again reviewed by our Home office Medical Staff. Under the group coverage, they still believe that our original benefits determination was correct."
Aetna's Mobile office informed the Lavoies of that last denial by letter dated 3 August 1978.
The provisions of the insurance contract, pertinent to this case, are:

"ARTICLE IIBENEFITS
"COVERED MEDICAL EXPENSES
"Covered Medical Expenses are the reasonable charges which an employee is required to pay for the following services and supplies received by a covered family member for the necessary treatment of any non-occupational injury or non-occupational disease:
"HOSPITAL EXPENSES: These are the charges made by a hospital, in its own behalf, for (a) Board and room....
"...

"EXCLUSIONS, LIMITATIONS AND PROVISIONS APPLICABLE TO ALL TITLES UNDER ARTICLE II
"...
"No insurance is afforded under any Title of Article II as to charges
"...
"(5) for care, treatment, services or supplies which are not necessary for the treatment of the injury or disease concerned nor to the extent that any charges for care, treatment, services or supplies are unreasonable...."
Aetna raises four issues on appeal:
"(1) Whether the plaintiffs met their burden of proof on the bad faith refusal claim;

*1066 "(2) Whether the partial payment made by Aetna precluded a finding of bad faith refusal to pay;
"(3) Whether the evidence adduced at trial was sufficient to support an award of punitive damages in the amount of $3,500,000 against Aetna;
"(4) Whether the trial court erred in allowing the plaintiff, Roger Lavoie, to give testimony, over Aetna's objection as to the plaintiff's poor financial condition."
Under the evidence in this case, questions one and three must be answered in the affirmative. Questions two and four must be answered in the negative.

I
The evidence is overwhelming that Aetna acted in bad faith. Its conduct placed it squarely within the definition of bad faith as stated by Justice Beatty in Gulf Atlantic Life Insurance Co. v. Barnes, 405 So.2d 916 (Ala.1981):
"`No lawful basis' ... means that the insurer lacks a legitimate or arguable reason for failing to pay the claim.... `Coupled with actual knowledge of that fact' implies conscious doing of wrong. Bad faith, then, is not simply bad judgment or negligence. It imports a dishonest purpose and means a breach of known duty, i.e., good faith and fair dealing, through some motive of self-interest or ill-will." Id., at 924.
and
"The relevant question before the trier of fact would be whether a claim was properly investigated and whether the results of the investigation were subjected to a cognitive evaluation and review. Implicit in that test is the conclusion that the knowledge or reckless disregard of the lack of a legitimate or reasonable basis may be inferred and imputed to an insurance company when there is a reckless indifference to facts or to proofs submitted by the insured." Id. (Emphasis added.)
Did Aetna review the claim on four separate occasions, in good faith, considering all facts available to it and according to its own established rules and procedures? To the contrary, the record is replete with evidence that at no time did Aetna review the claim in good faith, consider all the facts available to it and comply with its own established rules and procedures. It never obtained the hospital progress records or progress notes.
Brenda Harris, a senior claims processor in the Aetna Mobile office, with twelve years' experience in handling claims, was the first one to examine the Lavoie claim and, at the time, was primarily responsible for the claim within the Aetna Mobile office. She testified the denial of the claim was solely because of the reasons stated in the letter from Harris dated 3 June 1977.
Harris testified that Mrs. Lavoie's admitting diagnosis, ulcerative colitis, would have qualified her for coverage under the group medical policy that had been underwritten by Aetna, and the policy itself was in full force and effect at the time of Mrs. Lavoie's admission to the Mobile Infirmary.
Harris, on 5 April 1977, had sent some medical records to one Jean Becker, an Aetna senior claims examiner in Hartford, for review. They were identified by Dr. Bernard Swan, a member of Aetna's Home Office Medical Department, the only physician at Aetna who ever reviewed the Lavoie claim. He identified them as the admitting sheet, with diagnosis; medical history and physical; doctor's orders; discharge summary and certain extraneous information. The nurses' notes, which Dr. Swan stated were an integral part of the chart, were not supplied at that time. They were not obtained until April of 1978, a year later. Harris, at the Mobile office, acknowledged that the nurses' notes were not included in the information originally sent to the home office at the time of the first denial. She testified that significance of the nurses' notes was that they contained daily information on what was done to the patient, what medications were administered, and whether a patient was experiencing pain or physical illness on a *1067 given date. Tom Hutton, an Aetna Home Office senior claims examiner at the time of his review of the Lavoie file in 1977, also testified he considered the nurses' notes to be a significant portion of any medical file, much more so from a physician's standpoint than a nurse's standpoint. The patient's progress notes were also omitted from the information sent to the home office during the first review of the Lavoie claim. Hutton also noted the significance of the patient's progress notes in a hospital file. Also, he said that, procedurally, had he seen certain of the entries that were actually on Mrs. Lavoie's progress chart during this review of a claim he would, recognizing he is not medically qualified to make a decision as to whether a person's hospitalization would be reasonable in light of such information, first go through his Medical Department for a medical doctor's review before denying Lavoie's claim.
It should be noted there were a total of four reviews and four separate denials of the Lavoie claim by the Aetna Home Office claims staff. At no time did Aetna ever obtain Mrs. Lavoie's progress records and progress notes during its respective reviews and denials of the claim.
After submission of the Lavoie material to Aetna's Home office, it responded, on 27 April 1977 by directing its Mobile office to deny payment of the room and board charges and those charges for tests, including CAT scan (computer assisted tomogram), EEG (electroencephalogram) and an EKG (electrocardiogram), administered to Mrs. Lavoie during her hospitalization. The Home Office response stated the file had been reviewed with "a member of the Medical Department" and further that "on the basis of limited information submitted, this confinement does not appear to have been medically necessary. We feel this patient could have been evaluated and treated on an out patient basis." Payment of these charges was denied because, allegedly, the tests were not "usual and customary for the diagnosis given."
According to the evidence, Aetna's Medical Department's alleged review was the primary reason for denial of the Lavoie claim. Aetna's Becker testified that, in her experience as a group claims representative in the field, the procedure for handling such group medical claims was to refer them to the senior claims examiner at the Home office, who in turn would refer the claim to the Medical Department.
Aetna's witness, Dr. Swan, testified he, as an associate medical director, worked in the claims department and reviewed complicated problems which required a medical opinion.
In the 27 April 1977 inter-office memo, Becker, the senior claims examiner in Hartford, speaks about review of the subject file "with a member of the Medical Department." She did not consider herself as being in the Medical Department. The reference to a member of the Medical Department is obviously a reference to Dr. Swan. This fact is shown by Dr. Swan's own testimony. Becker's testimony makes clear that her reference to the Medical Department was a reference to the doctor. Clearly, Hutton, the senior analyst in Hartford, according to Becker, was not a member of that Medical Department.
Dr. Swan testified the "Claim Medical Department" was comprised of six physicians. The testimony of Becker shows it was the customary procedure at Aetna for the various regional claims offices to refer claims to the senior examiners in the Home Office, who in turn referred the claims to the Medical Department for review.
The testimony of Harris acknowledges that her deposition testimony, in January 1980, made a clear distinction between Hutton, the senior claims examiner at the Home Office, and the Home Office medical department. Harris, in her trial testimony, admitted that in her entire deposition she never stated Hutton and the Medical Department at Hartford meant one and the same thing to her.
The following appears during Harris's testimony:
"Q: Do you recognize the medical department as being physicians, don't you?

*1068 "A: I do now, yes, sir.
"Q: No ma'am no. At the time you gave this deposition before you gave your affidavit, at the time you gave your deposition.
"A: At the time I gave my deposition I did, yes, sir.
"Q: O.K. and before you gave the affidavit, right?
"A: Right."
However, in her affidavit of 28 February 1980, about thirty-five days after her deposition, filed in support of Aetna's motion for summary judgment, she swore:
"I understand that an ambiguity may exist concerning my letter of December 23, 1977, to Thomas J. Stein. I stated in that letter that I had again checked with our Medical Department on this matter and they have advised that based on the information available to us, we must continue to deny benefits for the room and board."
In the same affidavit, Harris noted that she customarily referred to the senior claims examiner in Hartford as "our Medical Department."
On 4 November 1977, Dr. Douglas, Mrs. Lavoie's treating physician wrote a very detailed medical report to Thomas J. Stein, Mrs. Lavoie's attorney at the time. Dr. Douglas explained in detail why Mrs. Lavoie required a twenty-three day period of confinement and why the tests, for which Aetna declined to pay, were relevant and necessary for her treatment at the time they were prescribed. Harris received the letter as an enclosure in a letter from attorney Stein to Aetna dated 8 November 1977. Harris called Hutton, the senior claims examiner at Hartford, on 9 November 1977. She testified she told Hutton she had additional information concerning the Lavoie file. She had no dealings with him on the Lavoie file before that time. She then read him the letter from the lawyer and from Dr. Douglas. After she read the doctor's letter to him Hutton instructed Harris to:
"Maintain the denial. If they act like they are going to file suit, send it back to me."
Shortly thereafter she wrote Stein, continuing to deny the claim and implying a need for more information. On 19 December 1977, Stein again wrote Aetna, sending another report from Dr. Douglas that attempted to answer Aetna's questions regarding the treatment he rendered Mrs. Lavoie. The next day, 20 December 1977, Harris again called Hutton. Again, Hutton did not have a medical doctor on the telephone with him. She read Hutton the letter from Dr. Douglas. After the letter was read, Hutton directed her to continue denying the benefits based on the information available, and directed her to write the denial letter of 23 December 1977. In response to those directions from Hutton, Harris wrote to Stein:
"I have again checked with our Medical Department on this matter, and they have advised that, based on the information available to us, we must continue to deny any benefits for the room and board."
That was in spite of two medical reports showing that hospitalization was necessary to rule out organic abdominal disease and also organic intracranial disease.
Harris and Hutton acknowledged that no medical doctor had ever reviewed either of the two medical reports that had been submitted to Aetna by the Lavoies.
Clearly, on two of the four separate and distinct denials of the Lavoie claim, Aetna violated all of its own recognized principles and procedures for handling such claims; by-passing the Medical Department that was the only source of medically qualified information available to Aetna and deliberately, intentionally and recklessly representing to the Lavoies that their file had been reviewed by a "member of the Medical Department."
Aetna's Dr. Swan told of the importance of having a member of the Medical Department, a physician, to pass judgment on complicated problems which require a medical opinion. Nevertheless, Harris wrote the Lavoie's attorney on 23 December 1977 stating she had "again checked" with the *1069 "Medical Department" regarding Dr. Douglas's letters. As a matter of fact, as of 23 December 1977, no member of the Medical Department had been consulted regarding Dr. Douglas's letters. She was fully aware of this when she wrote the 23 December 1977 letter to Stein.
The significance of Dr. Douglas's medical reports was noted by both Harris and Dr. Swan. Harris testified she recognized the importance of a treating physician's report to Aetna's Medical Department. She responded to questioning along this line as follows:
"Q: What is the importance of a doctor's report to the Medical Department?
"A. The Medical Department has to base their decision on what the doctor informs them.
"Q: And that's a hard and fast rule, isn't it?
"A: Yes, sir.
"Q: O.K., and the Medical Department has to review that doctor's report, isn't that right?
"A: Yes, sir.
"Q: No exceptions to that to your knowledge?
"A: Not to my knowledge.
"Q: You know that Mr. Hutton is not a medical doctor, don't you?
"A: Yes, sir.
"Q: Did you know it at the time that you called him on November 9, 1977?
"A: I knew that he was not a doctor, yes.
"Q: You knew that he was not a trained medical physician, correct?
"A: Yes, sir."
Dr. Swan's job at Aetna's Home Office Medical Department, he testified, was to "review complicated problems which require a medical opinion." He went on to volunteer the following under questioning by Aetna's own counsel:
"Q: Did you consider Dr. Douglas' letter?
"A: Yes. I was thumbing through it to tryI was interested in reviewing the letter, whether that's responsive to your question.
"Q: Yes, I was going to ask you. Did you pay attention to his letter? Did you read it?
"A: Yes, I did. I think the most important bit of information we like to get in such cases is a narrative report from the treating physician. It's the most logical source of information."
Another example of Aetna's intentional and fraudulent efforts to deceive the Lavoies was in connection with the initial handling and denial of the Lavoie claim. The initial request by the Mobile Office to the Hartford Group Claims office for a review of the Lavoie file was made on 5 April 1977. The Hartford Claims Office responded on 27 April 1977 with its initial denial. Becker recited that "this file has been reviewed with a member of the Medical Department." The evidence indicates that Dr. Swan, the only member of the Medical Department of Aetna who ever reviewed the Lavoie file, did not review the file material and records until 28 April 1977, one day after the original denial was sent to Mobile. Dr. Swan's own handwritten notes in the Home office file clearly show the first day he ever worked on the file was 28 April 1977. Dr. Swan worked in the Group Claims Office on only one day per week. 28 April 1977 was a Thursday. The date in Dr. Swan's own handwriting is "4-28-77."
R.E. Mann, another Aetna senior claims processor who reviewed the file, noted that "[w]e reviewed on 4/28/77 and denied coverage of some charges." Two to three months before the trial of this case and after it had been submitted to this court on appeal on two previous occasions where the critical nature of this particular date had become obvious, Becker, a senior claims examiner in Hartford, testified the "28" was a "25." Apparently, the jury didn't believe her.
Comparison of a "5" in Dr. Swan's handwriting found in the transcript with what Aetna contended was a "5" located elsewhere in the transcript makes it clear that Dr. Swan's review of the Lavoie file had *1070 been made on 28 April 1977, the day after the denial had been rendered by Ms. Becker.
Viewing this evidence most favorably to the Lavoies, the jury apparently rightfully concluded that senior claims adjustors writing final denials and then later going to the medical staff for rubber stamp approval was all in violation of Aetna's own in-house procedure, which required that medical claims be denied by a medical doctor, and further that such was wilful and bad faith conduct. Dr. Swan's testimony clearly indicated he was contacted only on complex cases requiring a medical opinion. The denial had already been made on this "complex" case without any medical opinion whatsoever when the initial denial was made on 27 April 1977.
It is conclusive evidence that, at the time the first of the four denials was made of the Lavoies' claim, Aetna had no legal justification for denial of the claim at all, having established by its own testimony that a medical opinion is required in order to properly deny such a claim, and the evidence clearly and convincingly shows that such a medical opinion was not obtained before the denial was made.
A review of Mann's handwritten summary of the Home Office's fourth review of the Lavoie file, and comparison of it with Dr. Swan's testimony on this point reveals that absolutely no mention is ever made by Mann of any new consultation with a physician in the Aetna Medical Department on the basis of the newly submitted information, the nurses' notes. But, on 25 July 1978, Mann rendered his own opinion that the denial should be maintained. According to Dr. Swan, three days later, 28 July 1978, a Friday, is the first time he ever looked at the newly submitted nurses' notes on this particular review of the file. Dr. Swan's handwritten notes, made on this second review, clearly shows his review took place on 28 July 1978.
Mann's 7-25-78 handwritten review and his 28 July 1978 inter-office communication contain no reference to either of Dr. Douglas's reports generated in November and December of 1977.
Hutton did not consider himself, as a senior claims adjuster, qualified to render a medical opinion. "That's why we have our Medical Department," he testified. Further, that Dr. Swan was consulted on "complicated problems which require a medical opinion." Harris stated "the Medical Department has to base their decision on what the doctor informs them [in his doctor's report]." This was a hard and fast rule at Aetna, with no exceptions. A review of the documents generated at Aetna note the significance of, and the necessity for, the Medical Department's review. Virtually every document generated by the Claims Department states: "our Home Office medical staff has again reviewed this claim."
There is a plethora of other places in the record of testimony and exhibits from which the only conclusion a reasonable person could draw is that Aetna, through its employees, was guilty of fraud, bad faith, and unfair dealing, had a dishonest purpose, and was motivated by self interest and ill will.
Clearly, then, under the evidence in this case, the "directed verdict on the contract claim" test is inapplicable because this is not the ordinary or normal case. Safeco Ins. Co. of America v. Sims, 435 So.2d 1219 (Ala.1983); McLaughlin v. Alabama Farm Bureau Mut. Cas. Ins. Co., 437 So.2d 86 (Ala.1983).
In order to fully comprehend the "extraordinary" nature of this case, it is first necessary to review the policy considerations, elements, and instructive guide posts set out by this court in earlier case law.
This court first recognized an actionable tort for an insurer's intentional refusal to pay a direct claim in Chavers v. National Security Fire & Casualty Co., 405 So.2d 1 (Ala.1981). Such a claim arises where there is either:
"`(1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) intentional failure to determine *1071 whether or not there was any lawful basis for such refusal.'"
The policy considerations inherent in this cause of action are that the law cannot tolerate, nor will it allow, the willful, deliberate refusal on the part of the insurer to evaluate or honor a claim with the knowledge that the avowed purpose of the insurance contract was to protect the insured at his weakest and most perilous time of need. Vincent v. Blue Cross-Blue Shield of Alabama, 373 So.2d 1054, 1067 (Ala.1979) (Embry, J., dissenting).
As noted above, Gulf Atlantic Life Insurance Co. v. Barnes, 405 So.2d 916 (Ala. 1981), defined the second tier of the tort of bad faith as set out in Chavers. Justice Beatty's instructive voice is particularly applicable here and bears repeating:
"The relevant question before the trier of fact would be whether a claim was properly investigated and whether the results of the investigation were subjected to a cognitive evaluation and review. Implicit in that test is the conclusion that the knowledge or reckless disregard of the lack of a legitimate or reasonable basis may be inferred and imputed to an insurance company when there is a reckless indifference to facts or to proof submitted by the insured...." (Emphasis added.)
Gulf Atlantic Life Insurance Co., 405 So.2d at 924.
Gulf Atlantic's instructions evidence this court's initial concern that the existence vel non of bad faith must be measured not in a vacuum, but under the circumstances, and at the time that the insurer denied the claim. Accordingly, where an insured relies upon the second tier of bad faith, as in this case, the insurer's reckless indifference to facts or to proofs submitted by the insured must be measured at the time of the denial.
National Security Fire & Casualty Co. v. Bowen, 417 So.2d 179 (Ala.1982), reiterated the elements of a bad faith action:
"(a) an insurance contract between the parties and a breach thereof by the defendant;
"(b) an intentional refusal to pay the insured's claim;
"(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
"(d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
"(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim." Id., at 183.
In determining that sufficient evidence was not produced which eliminated any "arguable reason" for National Security's refusal to pay plaintiff's claim, this court focused entirely upon an investigator's report, which was reviewed by National Security, and the concomitant circumstances. In fact, the court unambiguously declared:
"[T]hese principles cause us to inquire into the evidence establishing the reasons which prompted Rufus D. Johnson to recommend not paying Bowen the balance due under the policy. In exploring those reasons we must consider the information before Johnson at the time he made the decision not to pay Bowen." Id.
On still two more occasions this court has reiterated this most important factor in determining the existence vel non of bad faith.
"Whether an insurance company is justified in denying a claim under a policy must be judged by what was before it at the time the decision is made...." National Savings Life Insurance Co. v. Dutton, 419 So.2d 1357, 1362 (Ala.1982); Federated Guaranty Life Insurance Co. v. Wilkins, 435 So.2d 10 (Ala.1983).
The obvious reason for reviewing only the information and circumstances before the insurer at the time of the denial, is to view the conduct of the insurer within the factual framework existing at the time of its actions. To adjudge the existence vel *1072 non of bad faith in any other environment would be merely an exercise in judicial fiction.
Aetna insists that the conflicting testimony developed at trial concerning the reasonableness and necessity of the treatment rendered Mrs. Lavoie constitutes a genuine issue of whether the insurance contract benefits were due and owing to her. In light of such a disputed issue on the contract claim, Aetna argues, the plaintiffs were not entitled to a directed verdict on the contract claim at the close of the evidence. Citing National Savings Life Insurance Co. v. Dutton, 419 So.2d 1357 (Ala.1982), Aetna concludes that since a directed verdict on the contract claim was inappropriate, the Lavoies' bad faith claim should never have been submitted to the jury.
Two of five physicians testifying at trial stated that Aetna's actions in denying the claim were reasonable because the charges in question were not shown to be medically "necessary for the treatment of the injury or disease concerned," the language contained in the policy exclusion. Nevertheless, Aetna's argument is critically defective in that at the time of each successive denial Aetna had never once consulted any medical authority. That Aetna is now capable of creating a fact issue on the contract claim through expert testimony does not, and cannot, belie the fact that Aetna never sought medical consultation, nor reviewed the treating physician's detailed medical reports, nor reviewed any progress notes before denying an admittedly complicated medical claim. A thousand experts testifying retrospectively could not avert the fact that, without a doubt, Aetna recklessly disregarded the facts and proofs of claim submitted by the Lavoies. Gulf Atlantic Life Insurance Co., 405 So.2d at 924.
Herein lies the "extraordinary" nature of this case. In the face of such overwhelming evidence, reasonable men could not disagree, that Aetna was guilty of bad faith, ill-will, oppression and malice in their successive refusals of the Lavoie claim. However, Aetna, through evidence of its own creation, is now capable of raising a factual dispute over the contract claim. To allow Aetna to wholly evade liability through legal artifice under the circumstances of this case would be to reward it for the very conduct which the tort of bad faith was originally recognized to admonish. At some point, some one must declare, "The emperor has no clothes." We take that opportunity today.
Aetna incorrectly reads the case of National Savings Life Insurance Co. v. Dutton, 419 So.2d 1357 (Ala.1982), as requiring an application of the directed verdict test in every bad faith case. We do not read Dutton in such a restrictive fashion. This court stated in Dutton:
"In the normal case in order for a plaintiff to make out a prima facie case of bad faith refusal to pay an insurance claim, the proof offered must show that the plaintiff is entitled to a directed verdict on the claim and, thus, entitled to recover on the contract claim as a matter of law. Ordinarily, if the evidence produced, by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the tort claim must fail and should not be submitted to the jury." (Emphasis added.) Id. at 1362.
First of all, nothing in this critical proposition was intended to retract or modify the fundamental concept that an insurance company's bad faith is adjudged by what was before it at the time the decision to deny the claim was made. In fact, this very principle is clearly set out, as well as applied, in Dutton. See Dutton, 419 So.2d at 1362. This court found that hospital records, relied upon by the insurer in denying Mrs. Dutton's claims, indicated that she had suffered chest pains for two or three years. This was in direct contradiction to Dutton's insurance application, another document relied upon by the insured at the time of the denial.
Second, Aetna has ignored the qualifications placed on the directed verdict test *1073 noted above. In his concurring opinion, Justice Jones noted:
"These are significant qualifications. Certainly, extreme cases will arise in which a fact issue will present a jury question on that claim...." Id., at 1362-63.
This is such an extreme case.
Furthermore, in Safeco Insurance Co. of America v. Sims, 435 So.2d 1219 (Ala. 1983), this court held:
"We are of the opinion that the finding of justiciable controversy is not the determining factor of whether there was or was not bad faith on the part of an insurance company to pay a claim. The standard for testing a bad faith claim is not found in either the adjudication of a justiciable controversy or the judgment on the merits of the contract claim." (Emphasis added.) Id., at 1223.
Again, Justice Jones, in his special concurring opinion, amplified the meaning of the majority's quoted language.
"The standard for testing a bad faith claim is to be found neither in the adjudication of a justiciable controversy, standing alone, nor in the judgment on the merits of the contract claim. This is not to say, of course, that either of these holdings is irrelevant to the bad faith issue. To be sure, the filing of a declaratory judgment action, under appropriate circumstances, may evidence a good faith attempt to seek a prompt resolution of a disputed claim. If, on the other hand, the refusal to pay is without legal excuse, the mere filing of a declaratory judgment action, followed by a finding of justiciable controversy, may enhance rather than diminish the degree of bad faith." (Emphasis added.) Id., at 1224.
In commenting directly upon the Dutton case, Justice Jones stated:
"This `directed verdict on the contract claim' test is not to be read as requiring, in every case and under all circumstances, that the tort claim be barred unless the trial court has literally granted plaintiff's motion for a directed verdict on the contract.... Merely because the insurer may be able to withstand a directed verdict motionthe existence vel non of the record entry itself being an issue of factwould not, as a matter of law, bar the plaintiff's tort claim...." Id., at 1225.
A hypothetical raised by the Lavoies illuminates the legal inconsistencies and inequitable consequences which would surely arise should the court adopt, as Aetna suggests, an unyielding, universal application of the directed verdict test. We now offer that hypothetical in a modified form. Assume that an insured submits a valid medical claim to an insurance company in the amount of $20,000. Although the company knew it was contractually obligated to pay the claim, it nevertheless, with malicious and oppressive intentions, decided to deny $15,000 of the claim. In order to accomplish this, assume that ten employees of the insurance company's medical staff and claims department confederated to create a totally false and absolutely unsubstantiated reason for denying the claim. As litigation over the nonpayment ensued, assume that all ten employees "stuck to their story" in their depositions. At trial however, suppose that nine of the ten employees broke down on the stand, admitting they had lied in deposition, and further agreeing with the plaintiff's contentions that they had indeed engaged in a conspiracy to deprive the plaintiff of his contractual benefits. Nevertheless, assume that the one lone claims superintendent insisted the company had based its denial on a fairly debatable aspect of the insured's claim. Under such a scenario, in light of the scintilla rule, a directed verdict on the contract claim would be inappropriate. Accordingly, under blind adherence to a directed verdict standard, as Aetna recommends, the bad faith claim would never go to the jury.
Such simply cannot be the law. The tort of bad faith had as its genesis the very idea of providing a plaintiff who had been victimized by the intentional, wrongful handling of a claim by the insurer, the right to recover not only contract damages but for the loss occasioned by emotional suffering, *1074 humiliation, and embarrassment in addition to punitive damages. The plaintiff's right to recover for the malicious and oppressive denial of a valid insurance claim must not be allowed to rest precariously upon the insurer's ability to retrospectively create an issue of fact on the contract claim. As Justice Jones adeptly foresaw and forewarned:
"The mere filing of a declaratory judgment action, followed by a finding of a justiciable controversy, may enhance rather than diminish the degree of bad faith." Safeco Insurance Co., 435 So.2d at 1224.
Our findings today, in this narrow context, are likewise consistent with the recent decision of National Security Fire & Casualty Co. v. Vintson, 454 So.2d 942 (Ala. 1984). In Vintson, this court, citing National Savings Life Insurance Co. v. Dutton, supra, applied the directed verdict test in determining that the plaintiff's bad faith claim was improperly submitted to the jury. The critical facts presented by that case, however, are clearly distinguishable.
In Vintson, the plaintiff alleged that a National Security agent, in an effort to induce the plaintiff to buy fire insurance, represented that the plaintiff's mobile home would be covered from the moment he submitted his application and premium check to the insurance company. Vintson submitted his application and check to the National Security agent who forwarded it to the home office for processing. Shortly thereafter, Vintson's mobile home burned.
At trial, National Security's agent denied making the alleged representations to the plaintiff regarding the time coverage would commence. Consequently, a fact issue concerning the existence of the contract itself was created.
Furthermore, evidence presented at trial proved that at the time National Security denied the claim, it had before it the standard application for insurance and that until an application for insurance was approved by the company, and the policy was issued and delivered, no policy of insurance was binding. We concluded that the above facts in and of themselves satisfied the requirement of a debatable reason thereby precluding submission of the bad faith claim to the jury.
In stark contrast to the facts in Vinston, here the existence of an insurance contract is undisputed. Thus, in addition to all the rights and obligations set out by the contract itself, arises the duty, implied by law, to use good faith and fair dealing so as to not interfere with the other party's expectation of performance. Chavers v. National Security Fire and Casualty Co., 405 So.2d 1, 6 (Ala.1981). See also Vincent v. Blue Cross-Blue Shield of Alabama, 373 So.2d 1054, 1060 (Ala.1979) (Jones, J., concurring specially).
Did Aetna breach this duty in denying the Lavoie claim? The inescapable answer is, yes. As distinguished from the situation in Vintson, Aetna failed to follow its own in-house procedures in denying the claim. This court found a debatable reason existed in Vintson based upon what was before National Security at the time of the denial and in light of the existing circumstances; specifically a mere application for insurance and an in house requirement that an application be approved, a policy issued, and a policy delivered, before coverage was extended. In contrast, it is undisputed that Aetna had before it a complicated medical claim and an in-house requirement that all complicated medical claims be reviewed by the medical department. This it failed to do on four successive occasions.
Moreover, in Vintson, as well as in Dutton, this court found that based upon what was before the insurance company at the time of the denial, the insurer had no duty to investigate the claim further. In Dutton, the insurance company in denying the claim invited the insurer to submit additional medical information. This was not done. A similar invitation was extended by Aetna in this case. Mrs. Lavoie responded on two separate occasions by having her treating physician write Aetna and outline the necessity of her hospital confinement. Aetna, upon receiving this requested information, did nothing. In our view, this is precisely *1075 the "reckless indifference to the facts and proofs submitted" which Gulf Atlantic Life Insurance Co. v. Barnes, supra, originally delineated as reprehensible conduct, in breach of the duty of good faith and fair dealing.
Accordingly, we hold that under the "extraordinary" facts of this case, the bad faith claim was properly submitted to the jury.

II
The second issue raised by the appellant concerns whether Aetna's partial payment of the Lavoie claim, by law, precludes a finding of bad faith refusal to pay. Aetna argues that its payment of some $1,300 of the $3,000 Mobile Infirmary bill constitutes a complete defense to the tort of bad faith. In support of this argument, Aetna relies principally upon Sexton v. Liberty National Life Insurance Co., 405 So.2d 18 (Ala. 1981).
In Sexton, this court upheld a summary judgment entered in favor of the defendant, Liberty National Life Insurance Company, on the bad faith refusal to pay count. In doing so, this court noted that the record was wholly devoid of any evidence even tending to show an intentional failure to honor a meritorious claim on the part of the insurer. In reference to the alleged refusal we stated:
"Having paid a substantial part of the claim, the failure to pay another part could well have been a clerical error...." Id., at 22.
This statement merely highlights the lack of evidence supporting bad faith proffered in Sexton and further emphasizes the proposition that a plaintiff must show more than a mere nonpayment, but a bad faith nonpayment. National Security Fire and Casualty Co. v. Bowen, 417 So.2d 179, 183 (Ala.1982). Neither the language cited above, nor any other language in Sexton reaches the proposition, gleaned by the appellants, that a partial payment of an insurance claim establishes an absolute defense to a bad faith refusal to pay action.
Likewise, a partial payment and a full payment were respectively considered in National Security Fire and Casualty Co. v. Bowen, supra, and Cincinnati Insurance Co. v. Little, 443 So.2d 891 (Ala. 1983). In each instance, this court held that bad faith claims were improperly submitted to the jury in light of the absence of any evidence proving a refusal based on bad faith. While it is true that partial payments may be considered as evidence of a lack of a dishonest purpose or ill-will in an insurer's denial, it does not follow that partial payment, in and of itself, precludes recovery under a bad faith theory. Otherwise, an insurer could avert liability in tort even though the evidence conclusively proved that the insured was the victim of an intentional denial of a portion of a claim which was not otherwise reasonably debatable. In fact, situations may be envisioned where a partial payment is made solely for the purpose of disguising the intentional, oppressive, malicious denial of the remainder of a claim. Under such a scenario the existence of bad faith would be enhanced, rather than diminished.
Under the facts of this case, any inference of the lack of a dishonest purpose afforded Aetna, due to its partial payment, has been crushed beneath the overwhelming weight of evidence proving that Aetna's dealings with the Lavoie claim on four occasions were infected with conspiracy and deceit. Accordingly, the bad faith claim was properly submitted to the jury despite the existence of partial payments made by Aetna.

III
We now turn to whether the jury verdict of $3,501,650.22 is so excessive that it must be set aside.
Gulf Atlantic Life Insurance Co. v. Barnes, 405 So.2d 916 (Ala.1981), announced that punitive damages were recoverable under the tort of bad faith. In distinguishing between the bad faith conduct which gives rise to compensatory damages as opposed to punitive damages, this court noted:

*1076 "`It does not follow that because plaintiff is entitled to compensatory damages that he is also entitled to exemplary damages. In order to justify an award of exemplary damages, the defendant must be guilty of oppression, fraud or malice.... While we have concluded that defendant violated its duty of good faith and fair dealing, this alone does not necessarily establish that defendant acted with the requisite intent to injure the plaintiff.' ..." 405 So.2d at 925 (quoting Silberg v. California Life Insurance Co., 11 Cal.3d 452, 113 Cal.Rptr. 711, 521 P.2d 1103 (1974).)
The purpose behind the imposition of punitive damages is twofold: (1) to punish the defendant for his oppressive, willful acts and (2) to warn or deter others in similar businesses from equally reprehensible conduct. Badgett v. McDonald, 53 Ala.App. 726, 728, 304 So.2d 228 (Ala.Civ.App.1974). The imposition of punitive damages in a fraud case is discretionary with regard to both the enormity of wrong and the necessity of preventing similar wrongs. Ford Motor Credit Co. v. Washington, 420 So.2d 14, 17 (Ala.1982). Carlisle v. Miller, 275 Ala. 440, 155 So.2d 689 (1963), echoed the guiding rules of review where any jury verdict is challenged as being excessive:
"It is most platitudinous to restate the guiding rules, but here they are: the verdict of a jury should not be interfered with merely because in the opinion of the court the jury gave too little or too much... and the authority vested in the courts to disturb a verdict of the jury on the ground of excessiveness is one which should be exercised with great caution.... Where, as here, there is no set standard for the admeasurement of damages but the damages to be awarded are left to the sound discretion of the jury, a remittitur or a new trial should not be ordered on the ground of excessiveness of the jury verdict except in those cases where the court can clearly see that the verdict has been reached on account of bias, passion, prejudice, corruption or other improper motive or cause ... and only where the damages allowed are so excessive as to warrant the belief that the jury must have been misled by some mistaken view of the merits of the case should the court interfere and set the verdict aside ... also, where the trial court refuses to grant a new trial because he does not believe the verdict is excessive the favorable presumption attending the jury's verdict is thereby strengthened." (Citations omitted.) (Emphasis added.) (Cited with approval in Aspinwall v. Gowens, 405 So.2d 134 (Ala.1981).)
After a careful review of the entire record, we cannot conclude that the verdict is so excessive as to warrant a finding that it was based upon bias, passion, prejudice or some other improper motive. The plaintiffs were able to show that the dark shadows of fraud and conspiracy enveloped each and every aspect of Aetna's actions regarding the handling of the Lavoie claim from the instance of the first denial and continued throughout the trial itself.
The evidence presented to the jury justifying such a large verdict may be analyzed in two categories: First, a recitation of the successive denials of the Lavoie claim which grew out of Aetna's oppressive, malicious, willful, fraudulent disregard for the rights of Mrs. Lavoie, and from which a jury could not only impute an intent to injure, but could hardly ignore it; second, an open court demonstration of fraud on the part of Aetna in an effort to evade liability at any cost.
The details of the Lavoie denials have been adequately set out in the foregoing portions of this opinion. Let it suffice to say, however, that the evidence of record supports the following findings:
(1) Aetna took the position that a woman who was bleeding bright red blood from the rectum, had flight of ideation, was acutely ill, and demonstrated personality changes, should have been treated as an outpatient.
(2) Aetna made its initial denial of the subject claim without any legal justification, and with no medical opinion to support *1077 the denial of a complicated medical treatment claim.
(3) Aetna made a second denial without any medical decision whatsoever, in violation of the established company procedure for handling such claims.
(4) Upon receiving medical letters detailing the need for hospital confinement and letter of inquiry from Lavoie's attorney, Aetna decided to wait to see if the Lavoies were going to file suit.
(5) Aetna made a third denial of the claim without any medically qualified opinion to support the denial, again in violation of the company's established procedures.
(6) Aetna intentionally misrepresented to the Lavoies that the claim had been repeatedly reviewed by members of the medical department.
(7) Aetna never had the "most important medical information" available on this file reviewed by any medical doctor during the course of the four denials.
Plaintiffs were successful in unveiling an effort on the part of Aetna to cover-up its wrongdoing. In effect, the jury witnessed an open court demonstration of the type of fraud which Aetna denied so vehemently.
A senior claims processor for Aetna, Brenda Harris, acknowledged at trial, that her deposition testimony of January 1980 unequivocally drew a distinction between Tom Hutton, the senior claims examiner at the home office, and the "Home Office Medical Department." Ms. Harris admitted at trial that not one time in her deposition did she ever tell plaintiff's counsel that Tom Hutton and the Medical Department were one and the same thing to her.
Nevertheless, plaintiffs read into evidence the sworn affidavit of Ms. Harris, filed by Aetna in support of its initial motion for summary judgment some 35 days after Harris's deposition, which is in direct contradiction to Harris's deposition testimony.
The affidavit reads in part:
"I understand that an ambiguity may exist concerning my letter of December 23, 1977, to Thomas J. Stein. I stated in that letter that I had again checked with our Medical Department on this matter and they have advised that based on the information available to us, we must continue to deny benefits for the room and board."
Thereafter, in the same affidavit, Ms. Harris notes that she "customarily" refers to the senior claims examiner in Hartford as our "Medical Department."
The jury could have rightfully concluded, and apparently did, that Ms. Harris's affidavit was nothing more than an attempt to cover-up, through deceit, past frauds committed in handling the Lavoie claim.
Likewise, Dr. Swan testified at trial that although he had reviewed "the letter" from Dr. Douglas, it did not contain information warranting a change in the recommendation to deny the claim. Plaintiff's counsel produced an affidavit signed by Dr. Swan, however, indicating that Dr. Swan had never once reviewed any letter from Dr. Douglas.
Lastly, Tom Hutton, a senior claims examiner, originally testified at trial that he had never reviewed the Lavoie file after 20 December 1977; this included the period of time when the nurses' notes were submitted and when the last claims denial occurred.
On cross-examination, Mr. Hutton was confronted with his sworn testimony in an earlier deposition. In that deposition, Mr. Hutton testified that he reviewed the file in 1978, discussed the review with Dr. Swan, reviewed the nurses' notes, and submitted Dr. Douglas's letters to Dr. Swan. All of the above would have been impossible, if in fact, as Hutton testified, he never reviewed the Lavoie file after 20 December 1977.
We note additionally that the trial judge denied Aetna's motion for a new trial or in the alternative, a remittitur, based on the excessiveness of the verdict. As the trial judge is in a position to judge both the demeanor of the witnesses and jurors, his denial of Aetna's motion must naturally strengthen the jury verdict.
*1078 Based upon the foregoing, we cannot conclude the verdict was a result of bias, passion, prejudice, or some other improper motive. Accordingly, it is our duty to leave it undisturbed.

IV
The final argument raised by the appellant concerns whether testimony regarding the Lavoies' financial condition was impermissibly allowed into evidence.
Aetna argues the following questions were not relevant and that their admission served only to raise the passion and bias of the jury:
"Q. What was your total family income, you and your wife from Social Security and your disability and your wife's disability in February of 1977?
"MR. CUNNINGHAM: Your Honor, that's not relevant at all. As to what his income is has nothing to do with the material involved in this lawsuit.
"MR. CROWDER: Your Honor, it's very relevant.
"THE COURT: Overrule the objection."
Mr. Lavoie went on to testify that his total income for that month was $700. On a second occasion Mr. Lavoie was asked:
"Q: Well, Mr. Lavoie, why didn't you just go ahead and pay the bill from the Infirmary and wait and see how the outcome of this would be?
"A: Because I didn't have the money."
The test of relevancy applied in Alabama is whether the offered evidence bears any logical relationship to the ultimate inference for which it is offered. C. Gamble, McElroy's Alabama Evidence § 21.01 (3d ed. 1977). The inference for which the evidence is offered, of course, must be material to an issue in the case. Ex parte Killough, 438 So.2d 333, 335 (Ala.1983).
In the case at hand, plaintiffs may properly recover compensatory changes for economic loss and mental distress. Gulf Atlantic Life Insurance Co. v. Barnes, 405 So.2d 916, 925 (Ala.1981); Chavers v. National Security Fire & Casualty Co., 405 So.2d 1, 7 (Ala.1981). In support of their theory of recovery, the plaintiffs offered proof that the bad faith refusal to pay the amount due for medical care to the Mobile Infirmary resulted in the plaintiffs' receiving collection letters and threats of suit from the Mobile Infirmary, a collection agency, and an attorney. All of this contributed to and caused the plaintiffs to suffer extreme emotional distress.
It is axiomatic that the law imposes a duty upon all plaintiffs to mitigate their damages. Britton v. Doehring, 286 Ala. 498, 507, 242 So.2d 666 (1970). We find the evidence in question to be admissible in order to show that the Lavoies were incapable of paying the Mobile Infirmary bill with their own finances, and thereby reducing the emotional distress caused by hounding creditors.
Accordingly, there appearing no error in the record, the judgment of the trial court is due to be, and it is hereby, affirmed.
AFFIRMED.
FAULKNER, JONES, ALMON, EMBRY and ADAMS, JJ., concur.
TORBERT, C.J., and MADDOX, SHORES and BEATTY, JJ., dissent.
TORBERT, Chief Justice (dissenting).
The tort of bad faith breach of an insurance contract was judicially created to fill a remedial void. Had it not been for the lack of adequate contractual damages, the need for this tort in the insurance context (and it thus far has been restricted to insurance in Alabama) would not have arisen. Traditionally, contract damages for breach of an insurance policy were limited by the classic case of Hadley v. Baxendale, 9 Ex. 341, 156 Eng.Rep. 145 (1854), to the face value of the insurance policy plus the legal rate of interest. Consequential damages for personal injuries, inconvenience, annoyance, loss of job or business, or mental anguish and suffering were not recoverable ex contractu, such damages being viewed as unforeseeable and not within the contemplation of both parties at the time of *1079 contract formation. This rule excluding consequential damages is still followed in non-insurance contexts in Alabama today. See, Jefferson County Burial Society v. Curry, 237 Ala. 548, 187 So. 723 (1939); Stead v. Blue Cross-Blue Shield of Alabama, 346 So.2d 1140 (Ala.1977). Of course, punitive damages are disallowed, as well.
In severely limiting contractual damages to the face value of the policy plus the legal rate of interest, the law created an incentive for insurers to refuse payment of even legitimate claims. The insurers had nothing to lose, and everything to gain, by refusing payment of even meritorious claims. At most, the assessed damages would equal the limits of the policy plus the legal rate of interest (sometimes far below the actual market rate). Any tangible consequential economic damages, such as loss of job or bankruptcy, and intangible damages, such as emotional distress, were borne entirely by the insured, on the basis that certainly they were not within the contemplation of the bargain of the parties. Consequential losses were allowed to lie where they fell, even in the case of intentional breach of contract.
If I were writing on a clean slate, yet enlightened by foreseeing the results of this Court's recognition of the tort of bad faith, I would be inclined to argue for an expansion of the damage rules in contract rather than creation of a new tort. There are several advantages to confining first-party insurance cases to the field of contract law, with an expansion of the damages remedy.
Contractual duties are consensual, and even when implied they have the virtue of implication from the contract itself. There are well-established rules for determining a breach and its consequences. Contracts is perhaps the most concrete and predictable body of legal doctrine, whose application is unlikely to defeat any valid expectation interests of the parties; this is certainly important in the insurance context, where predictability, at least of the statistical variety, is necessary in calculating premiums. Finally, judicial control of the excesses of passionate juries is less problematic in contracts than it is in the realm of torts. In contracts, the important issues are more often legal than factual, and any modification of damage rules would not require the availability of punitive damages.
In contrast to the virtues of contract law in general, and to a mere modification of contract damage rules in particular, the creation of any new tort is fraught with disadvantages, as our recent experience with the insurance-specific tort of bad faith demonstrates.
The duties recognized in tort are non-consensual, imposed from without, either because of a special relationship between the parties or because of perceived public policy implications. Such duties are of necessity amorphous, becoming in application little more than matters of degree, best suited to resolution by a jury. Tort duties are difficult to judicially define or confine; although most courts are content with the enunciation of standards, such as "reasonable care," in defining tort duties, wherever courts enunciate particular concrete rules, the process becomes endless, with attempts to cover each fact situation specifically as it arises, ultimately causing more confusion than clarity as the specific rules inevitably conflict.
Determining whether the breach of a tort duty has occurred is almost as problematic and fluid as is the initial definition of the duty. Unlike contracts, the comparative advantage in making this determination lies with the jury, and not the judge. Because tort cases are so fact-intensive and the liability rules so amorphous, the results at trial are unpredictable and often inconsistent, an especially undesirable consequence in the insurance context. Finally, in tort the scope of liability is much broader than in contract, especially with respect to intentional torts. Almost all damages proximately flowing from the cause are recoverable; and, of course, punitive damages are recoverable in the appropriate aggravating circumstances. This problem of excessive and even spurious damage *1080 awards could have been, and still can be, obviated by simply restricting the cause of action to contract and carefully expanding the contractual damages rules for non-commercial insurance contracts.
The foundation for such a carefully crafted expansion has already been laid in Alabama law. As already noted in Stead, supra, consequential damages have been viewed unfavorably in Alabama in recent years in breach of insurance contract cases, due to the fact that they were "too remote, were not within the contemplation of the parties, and [the fact] that the breach of contract is not such as will naturally cause mental anguish." Stead, supra, at 1143, citing Westesen v. Olathe State Bank, 78 Colo. 217, 240 P. 689 (1923).
Yet, certain exceptions to this general rule have long been recognized in Alabama and around the country. As quoted in Southern Ry Co. v. Rowe, 198 Ala. 353, 73 So. 634 (1915), and repeated in Stead, supra, at 1143, "... where the contractual duty or obligation is so coupled with matters of mental concern or solicitude, or with the feelings of the party to whom the duty is owed, that a breach of the duty will necessarily or reasonably result in mental anguish or suffering, it is just that damages therefore be taken into consideration and awarded."
Certainly an insurance contract is not an ordinary commercial contract for profit in which mental distress damages are unforeseeable. The insured does not bargain for a profit; instead he bargains for compensation in time of catastrophe and for peace of mind. In this sense, an insurance contract is more akin to contracts of carriers and innkeepers, for which consequential damages have long been recognized due to the personal nature of the service. A particularly likely risk of breaching an insurance contract is resulting impoverishment or bankruptcy. Coupled with the fact that such breaches almost always coincide with emotional vulnerability (death, health problems, or destruction of a business or home), a very strong case can be made for awarding consequential damages for financial loss and even for emotional disturbance. See, Restatement (Second) of Contracts, § 353, comment a (1982). Insurers, in effect, sell freedom from care and worry, and should be held to foresee the consequential damages flowing from their breach. Several cases in other jurisdictions have flirted with this approach. See, Reichert v. General Ins. Co. of America, 68 Cal.2d 822, 849, 69 Cal.Rptr. 321, 337, 442 P.2d 377 (1968) (dissenting opinion); Miholevich v. Mid-West Mut. Auto. Ins. Co., 261 Mich. 495, 246 N.W. 202 (1933); see also, K. Harvey and T. Wiseman, First Party Bad Faith: Common Law Remedies and a Proposed Legislative Solution, 72 Ky.L.J. 141 (1983-84).
Alabama courts have recognized that contracts dealing with new home construction are a special category, falling within the exception to the general damages rule, allowing recovery for mental anguish and annoyance and inconvenience, as well as other consequential damages deemed foreseeable. B & M Homes, Inc. v. Hogan, 376 So.2d 667, 671 (Ala.1979). The case is even stronger for creating such an exception for insurance contracts. Consequently, recent cases denying such damages for breach of insurance contracts should be overruled. See Sanford v. Western Life Ins. Co., 368 So.2d 260 (Ala.1979); National Sec. Fire & Cas. Co., Inc. v. Vintson, 414 So.2d 49 (Ala.1982) (consequential damages denied).
By making it attractive to sue alternatively, or even exclusively, in contract, this Court could have avoided many of the problems associated with developing a new tort. As an added benefit, much of the appellate workload would be reduced in reviewing excessive jury awards of punitive damages, since punitive damages are not available in contract.
The whole question of bad faith by insurance companies might be an issue more properly addressed by the legislature. The existing regulation of the insurance industries is a public-policy recognition by this state that consumers need some protection in this field. A proper balance between the two competing policy objectives inherent in *1081 claims of first-party bad faith must be struck.
"The first objective recognizes that an insured's cause of action for first party bad faith should entitle him to damages promised under the policy, and consequential damages `within the contemplation of the parties.' The second public policy implicated by first party bad faith is that the risks of excessive judgments should not be so unreasonable that they discourage insurers from challenging claims that are at least fairly debatable. Any effective resolution of the problem must address these two policy goals.
"The difficult questions raised by first party bad faith require a careful balancing of the competing interest. Unfortunately, the courts, restrained by principles of common law formulated to solve different problems, have found it difficult, and sometimes impossible, to achieve a workable balance.... Because of the failure of the common law to provide an effective resolution, a legislative solution is appropriate. The legislative forum can provide for the consideration and debate of all viewpoints, resulting in a proper balance."
K. Harvey and T. Wiseman, supra, at 190 (see also the statute proposed by the authors in the appendix at p. 195).
However, this is all water under the bridge for now, so we must struggle to manage what has come to be the unmanageable.
Chavers I established that there was a duty to use good faith and fair dealing so as to not to interfere with the other party's expectation of performance in an insurance contract. Chavers v. National Security Fire and Casualty Co., 405 So.2d 1 (Ala. 1981). An insurer will breach that duty if it intentionally refuses to settle a direct claim where there is either no lawful basis for the refusal, coupled with actual knowledge of that fact, or intentional failure to determine whether or not there was any lawful basis for such refusal. Id. at 7.
In the cases since Chavers I we have attempted to refine and clarify the Chavers I test. In Gulf Atlantic Life Insurance Co. v. Barnes, 405 So.2d 916 (Ala.1981), this Court said:
"The first tier of the test promulgated by Mr. Justice Embry and adopted by this Court in Chavers establishes that the tort of bad faith refusal to honor a direct claim arises when there exists `no lawful basis for the refusal coupled with actual knowledge of that fact.' `No lawful basis,' as expressed in that opinion, means that the insurer lacks a legitimate or arguable reason for failing to pay the claim. See Michael v. National Security Fire & Casualty Co., 458 F.Supp. 128 (N.D.Miss.1978). That is, when the claim is not fairly debatable, refusal to pay will be bad faith and, under appropriate facts, give rise to an action for tortious refusal to honor the claim. Anderson v. Continental Insurance Co., 85 Wis.2d 675, 271 N.W.2d 368 (1978). When a claim is `fairly debatable,' the insurer is entitled to debate it, whether the debate concerns a matter of fact or law. `Coupled with actual knowledge of that fact' implies conscious doing of wrong. Bad faith, then, is not simply bad judgment or negligence. It imports a dishonest purpose and means a breach of known duty, [i.]e., good faith and fair dealing, through some motive of self-interest or ill will.
"The second tier of the test is an elaboration on the first. The trier of fact, by finding, on the part of the insurer, an `intentional failure to determine whether or not there was any lawful basis for refusal,' may use that fact as an element of proof that no lawful basis for refusal ever existed. The relevant question before the trier of fact would be whether a claim was properly investigated and whether the results of the investigation were subjected to a cognitive evaluation and review. Implicit in that test is the conclusion that the knowledge or reckless disregard of the lack of a legitimate or reasonable basis may be inferred and imputed to an insurance company when there is a reckless indifference to facts *1082 or to proof submitted by the insured. Of course, if a lawful basis for denial actually exists, the insurer, as a matter of law, cannot be held liable in an action based upon the tort of bad faith. Otherwise, the insurer's knowledge of the non-existence of any debatable reasons for refusal would be a question for the finder of fact,i.e., the jury."
In National Security Fire and Casualty Co. v. Bowen, 417 So.2d 179 (Ala.1982), the elements of an action for bad faith which a plaintiff must prove were stated as:
"(a) an insurance contract between the parties and a breach thereof by the defendant;
"(b) an intentional refusal to pay the insured's claim;
"(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
"(d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
"(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim."
In National Savings Life Insurance Co. v. Dutton, 419 So.2d 1357 (Ala.1982), we said that normally in order for a plaintiff to make out a prima facia case of bad faith,
"the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law. Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the tort claim must fail and should not be submitted to the jury."
In Dutton and National Security Fire and Casualty Co. v. Vintson, 454 So.2d 942 (Ala.1984), we said that once the insurer establishes a debatable basis for denying a claim it has no affirmative duty to investigate further.
In light of these refinements in the law, I believe it is useful to re-evaluate the dimensions of the tort. Justice Embry in his dissent in Vincent v. Blue Cross-Blue Shield of Alabama, 373 So.2d 1054 (Ala. 1979), set forth the policy considerations mandating recognition of the tort of bad faith:
"Public policy favors the free exercise of rights arising from a contract by the parties to it.
"However, this is not to say that an insurer may in bad faith breach his contract with impunity. The law will not allow an insurer to wilfully refuse to evaluate or honor a claim with the knowledge that the avowed purpose of the insurance contract was to protect the insured at his weakest and most perilous time of need."
As this statement points out, the law should not sanction the intentional conduct of an insurer in either refusing to pay a claim knowing no debatable reason exists for not doing so or simply sitting back and taking no action on the claim. In effect the duty of good faith and fair dealing requires that if an insurer does not pay the claim there must be a debatable reason for not doing so.
When this Court actually "breathed life" into the tort in Chavers I, we attempted to define bad faith to encompass either of the evils described above. The first tier of the Chavers I standard recognized that an insurer acted in bad faith when it intentionally refused to pay a direct claim knowing that no lawful basis existed for that refusal. Although implicit in Chavers I, Bowen held that the plaintiff must prove the lack of a debatable reason. Bowen at 183. The second tier of the Chavers I standard, the intentional failure to determine the existence of a lawful basis for denying the claim, addresses the second evil, that is, failure to act on the claim. The second tier of the Chavers I standard makes it clear that an insurer acts at its peril if it fails to process the claim.
*1083 As stated by Justice Beatty in Barnes, the second tier is an elaboration on the first. That is, the second tier is also a method by which the insured can circumstantially prove that no debatable reason existed when the claim was denied because the insurer had not investigated the claim. But as Barnes also points out, if a debatable reason for denying the claim actually exists, "the insurer, as a matter of law, can not be held liable in an action based upon the tort of bad faith." Barnes at 924.
The focusing of the inquiry in bad faith claims on whether there is a debatable reason for denying the claim and generally away from the conduct of the insurer in investigating and evaluating the claim does not mean the law condons an insurer's conduct in not properly investigating and evaluating the claim. It stems from the recognition that without a threshold determination that the insurer had no debatable reason for denying the claim, the insured was in essence not injured, for the insured had no right to immediate payment of the claim.[1] No matter how badly the insurer acted in investigating and evaluating the claim, if there was a debatable reason for refusing to pay the claim, when payment was refused, the insured was not entitled to prompt payment. If a debatable reason exists, the insurer has the "freedom (and, perhaps, the duty) not to honor, and thus legally dispute, claims of questionable validity." Chavers I at 6 (quoting from Justice Jones's special concurrence in Vincent). The lack of proper investigation and evaluation is significant in proving another element of the tort, namely knowledge by the insurer of the lack of a debatable reason. Barnes at 924.
Dutton established that if the plaintiff was able to show the insurer lacked a debatable reason for denying the claim, plaintiff would ordinarily be entitled to a directed verdict on the contract claim, and therefore in the normal case a directed verdict on the contract claim was necessary to make out a prima facie case of bad faith. However, as the majority opinion in the present case points out, the conduct of the insurer is to be judged at the time of the denial, based upon the information the insurer had at that time. Bowen at 183; Dutton at 1362; Wilkins at 10. Thus, the Dutton test might be more accurately stated as follows: in the normal case the plaintiff should have been entitled to a directed verdict on the contract claim if the directed verdict determination was made on the basis of what had happened at the time of the denial.
I turn now to an examination of the facts in this case to determine whether at the time each denial was made there was a debatable reason for denying the claim.
On March 3, 1977, the hospital completed the appropriate forms and forwarded them along with a "History and Physical Summary," a "Discharge Summary," the physician's progress notes, and various other data, such as the consultation on the EKG, to the Aetna office in Mobile. Included was a bill for $3,028.25. The summaries stated:
"HISTORY AND PHYSICAL SUMMARY
"This 54 year old lady has been followed in the past for mechanical low back pain and osteoarthritis. She had not been seen in our office in about 3 years. She came in with the interval history that she had been retired for 2 years, that her arthritis had become more active over the last several months and she was having generalized arthritis pains in her back, neck and all extremities particularly in the hips, left knee and around the pelvic area. She complains of being very nervous. She said that she has been noticing some intermittent bleeding from the bowel and has a past history of diagnosis of chronic ulcerative colitis. Because of the general exacerbation *1084 of her arthritis and the apparent exacerbation of her ulcerative colitis, she is admitted at this time for evaluation and treatment.
"PAST HISTORY: She had gall bladder surgery in 1970, a fibroid tumor removed in 1946 and an exploratory laparotomy in 1953. She has a history of a couple episodes of pnemonia [sic] but denies history of peptic ulcer, hepatitis, rheumatic fever, diabetes or hypertension. She has a questionable history of glaucoma, does not know the severe state of it. She has had episodes of chest pain in the past, about 4 years ago, none recently. No diagnosis or EKG's were done at the time of the pain.
"FAMILY HISTORY: Positive for hypertension and she has a brother who had 1 episode of what was called inflammatory arthritis as a child. No family history of cancer, diabetes or early heart disease.
"DISCHARGE SUMMARY
"54-year-old white female who was admitted with an abdominal pain, osteoarthritis and mechanical low back pain. She had not been seen in my office for three years when she came in because of general aching and particularly saying that she had had intermittent bleeding from the bowel and had a past diagnosis of chronic ulcerative colitis. We are unable to substantiate this diagnosis in the hospital. In fact, she had a negative GI workup. Her musculoskeletal complaints while she does have some normal amount of osteroarthritis varying from place to place for her age, it is not really outstanding and her general situation suggests that she considerable [sic] psychogenic overlay to her somatic symptoms, and therefore, they are somewhat exaggerated. She has been placed on Mellaril in depth. She has shown some suggestion of slight improvement in the hospital but continues to somaticize her symptoms rather vigorously. It has been explained to her that this is primarily a nervous problem and we have mentioned that she may need the help of a psychiatrist if she does not continue to improve following discharge.

"DISCHARGE DIAGNOSIS: OSTEOARTHRITIS, MILD PSYCHOPHYSIOLOGIC REACTION MANIFESTED BY ABDOMINAL PAIN."
The supervisor of the Mobile office of the insurer, Alice Murphy, sent a request to the hospital for further information on March 24, 1977. This letter in pertinent part reads:
"It would be greatly appreciated if you would send complete hospital records including, admitting and discharge summary, nurses and physicians notes."
On April 5, 1977, before receiving anything further from the hospital, Brenda Harris, a claims worker for Aetna, forwarded the information she had from the hospital to Jean Becker, a "Senior Claims Examiner," in Aetna's office in Hartford, Connecticut. To the information forwarded, Harris appended a memorandum stating:
"In our opinion a 23-day confinement for the diagnosis was not necessary. Hospital records do not indicate anything to the contrary."
In pertinent part, Aetna's response reads:
"DATE: April 27, 1977
"...
"This file has been reviewed with a member of the Medical Dept. On the basis of the limited information submitted, this confinement does not appear to have been medically necessary. We feel this patient could have been evaluated and treated on an out-patient basis.
"Several of the X-ray and lab procedures performed are not usual and customary for the diagnosis given. These include the CAT Scan, EEK and EKG. Since the City of Mobile policy clearly limits coverage to services and supplies which are reasonably necessary for the diagnosis and treatment of nonoccupational disease or injury, room and board charges as well as the aforementioned *1085 miscellaneous charges must be denied. Thank you."
The Lavoies received notification, by a letter from Harris, on June 3, 1977, which reads in full:
"After having this file reviewed by our Medical Department we must, at this time, deny benefits for room and board charges.
"From the information we submitted to them it appears the evaluation and test could have been performed on an out-patient basis. Also, we must deny charges for the CT Brain Scan, EEG and EKG since they are not usual and customary procedures for the diagnosis given.
"If you have any questions please feel free to contact this office."
The defendant then paid the hospital for the medical diagnostic tests, other than the EEG, EKG, and CAT scan, physical therapy and a back brace. Dr. Douglas was paid $300.20 and the Lavoies were paid $217.34 directly. The parties stipulated the remainder on the claim was $1,650.22.
Under the insurance policy Aetna was only bound to pay for expenses arising from treatments, procedures, etc., that were medically necessary. The denial of payment of some of the expenses was on the basis that Aetna decided some expenses were not medically necessary. Was it reasonably debatable at that time that the denied expenses were medically necessary? Under these facts, I think not.
There is credible evidence from which the jury could conclude that the Lavoies' claim was never reviewed by Aetna's medical department. The fact that it is debatable whether the claim was reviewed by the medical department is not the sort of factual controversy that is sufficient to defeat a bad faith claim. When the facts which create a debatable reason emanate from the insurer, a blind adherence to the directed verdict rule would essentially abolish the tort. See Safeco Ins. Co. v. Sims, 435 So.2d 1219 (Ala.1983) (Jones, J., concurring specially). If, in fact, the claim was not reviewed by the medical department, what facts would allow Aetna to say it was debatable whether the expenses were medically necessary? While I am not prepared to say that under no circumstances would an experienced claims examiner be able to determine that certain medical expenses were medically unnecessary, there is no evidence that the examiners who handled this claim had the experience to do so nor that they made the decision based upon their own experience. In fact, the testimony here indicates that the examiners knew that medically trained personnel needed to review the claim. Therefore, I conclude that at the time Aetna first denied the claim it had no debatable reason for doing so.
However, it is interesting to note that this appears to be a case where the insurer thought there was a debatable reason for denying the claim and could have established one, and did establish one after the first denial. Dr. Swan apparently did review the Lavoie file before the second denial was made. At that point, assuming that there was no evidence that Dr. Swan lied, Aetna established credible medical evidence that the expenses did not result from medically necessary procedures. Expert testimony at trial supports Dr. Swan's initial determination.
While Aetna's conduct in reviewing the claim after the initial denial was questionable, I believe that Aetna was justified in denying the claim based upon the advice of Dr. Swan.[2] Establishing a debatable reason for denying the claim after the initial denial forecloses any determination that the subsequent refusals to pay were made in "bad faith", in the absence of new information eliminating the debatable reason at the time of those refusals.
*1086 However, it is not sufficient simply to find that no debatable reason exists for refusing to pay the claim. The plaintiff must also show that the insurer knew that no debatable reason existed. Bowen, supra. Here the testimony shows that Brenda Harris questioned the propriety of a 23-day hospital stay and thought it was medically unnecessary. Apparently Jean Becker, the senior claims examiner who actually denied the claim, believed that the expenses were not medically necessary. While the knowledge element of the tort, like any mental state requirement in any tort, almost always must be proved circumstantially, I am unable to find any evidence that would authorize a jury to find that Aetna knew no debatable reason existed. In fact, the evidence supports the conclusion that Aetna thought, and, as it turns out, was correct in thinking, that a debatable reason did exist and therefore that denial of the claim was proper.
I conclude that while the Lavoies proved that initially there was no debatable reason for denying the claim, they did not prove that Aetna knew there was no debatable reason for denying the claim, and therefore the judgment for them on the bad faith claim should be reversed.
BEATTY, J., concurs.
MADDOX, Justice (dissenting).
Admittedly, the facts of this case are such that it would appear from the facts set out in the majority opinion that the insurer was guilty of a bad faith refusal to pay an insurance claim, but when the basic facts necessary to a resolution of this case are examined against the rule of law established in bad faith cases, it is apparent that the insureds were not entitled to recover on the bad faith claim, because they failed to meet their burden of showing that the insurer "had no legal or factual defense to the insurance claim." National Security Fire & Casualty Company v. Vintson, 454 So.2d 942 (Ala.1984).
In Vintson, in which the Chief Justice and every Associate Justice concurred, except Justice Faulkner, who concurred in the result, this Court reviewed the law of bad faith refusal to pay an insurance claim, and concluded that when a claimed misrepresentation by a company agent presents a jury question, a "debatable reason" exists for denying liability on a bad faith claim. Because Vintson is the latest expression of the law of bad faith refusal to pay an insurance claim, and because every member of this Court concurred in the opinion or the result reached in the opinion, I believe it would be instructive to quote extensively from that opinion, because the facts in this case are not so dissimilar that a different result should be reached here from what was reached in that case. There, the Court opined:
"Before we consider whether the denial of the directed verdict was proper under the specific facts of the present case, we look first at the evolution of the tort of bad faith refusal to pay a direct insurance claim in this state. This Court stated in Chavers v. National Security Fire & Casualty Co., 405 So.2d 1, 7 (Ala. 1981):
"`[A]n actionable tort arises for an insurer's intentional refusal to settle a direct claim where there is either "(1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) intentional failure to determine whether or not there was any lawful basis for such refusal."' (Emphasis added.)
"Later, in National Security Fire & Casualty Co. v. Bowen, 417 So.2d 179, 183 (Ala.1982), we held:
"`No lawful basis "means that the insurer lacks a legitimate or arguable reason for failing to pay the claim." Gulf Atlantic Life Ins. Co. v. Barnes, Ala., 405 So.2d 916 (1981). When a claim is "fairly debatable," the insurer is entitled to debate it, whether the debate concerns a matter of fact or law. Ibid.

"`Under those authorities the plaintiff in a "bad faith refusal" case has the burden of proving:

*1087 "`(a) an insurance contract between the parties and a breach thereof by the defendant;
"`(b) an intentional refusal to pay the insured's claim;
"`(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
"`(d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
"`(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.
"`In short, plaintiff must go beyond a mere showing of nonpayment and prove a bad faith nonpayment, a nonpayment without any reasonable ground for dispute. Or, stated differently, the plaintiff must show that the insurance company had no legal or factual defense to the insurance claim. [Emphasis in original.]
"`The "debatable reason" under (c) above means an arguable reason, one that is open to dispute or question. Webster's Third New International Dictionary (1931) at 116. See Chavers at 10; see also Embry, J., concurring on rehearing in Aspinwall v. Gowens, Ala., 405 So.2d 134 (1981).'
"More recently in National Savings Life Ins. Co. v. Dutton, 419 So.2d 1357 (Ala.1982), this Court emphasized the heavy burden that a plaintiff must bear in a bad faith case. Dutton, supra, held:
"`In the normal case in order for a plaintiff to make out a prima facie case of bad faith refusal to pay an insurance claim, the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law. Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the tort claim must fail and should not be submitted to the jury.' 419 So.2d at 1362.

"Dutton also stated that `[w]hether an insurance company is justified in denying a claim under a policy must be judged by what was before it at the time the decision is made.'"
Vintson, supra, at 944.
In Vintson, the insured had claimed that an agent of the insurer had told him he had fire insurance coverage, and the insurer had later denied that there was coverage. Because of this dispute between the insurer and the insured, this Court, in Vintson, held that "[t]here was conflicting testimony concerning [a] conversation between Vintson [the insured] regarding the time that the policy would take effect," and held that the insured failed to establish a bad faith failure to pay an insurance claim.
In this case, the crucial factual question was whether the 23-day hospital confinement and the diagnostic tests were reasonably necessary in view of the discharge diagnosis, which without question read:

"OSTEOARTHRITIS, MILD PSYCHOPHYSIOLOGIC REACTION MANIFESTED BY ABDOMINAL PAIN."
The insurer concedes that the insureds made out a prima facie case on their contract claim, but they do not concede that the insureds met their burden of showing that they were entitled to recover on the contract claim as a matter of law; consequently, they contend that the insureds failed to show they were entitled to a directed verdict on their contract claim. The insureds agree with the insurer in this contention.
They candidly admit that the evidence was conflicting on whether the 23-day hospital stay, the EKG, EEG, and CAT scan were, without question, medically necessary, but they contend that what they describe as the "physician war" which occurred at the trial of the case was merely a "side show" and was put on by the insurer *1088 "to obscure, for both the jury and the judge and for this Court on appeal, those acts of fraud, conspiracy and intentional deceit perpetrated upon its insured during the course of its handling of the claim." They claim that they proved that the insurer intentionally violated its own in-house procedures for the handling of claims, intentionally refused to review the most important medical information which could be submitted in a given case (the treating physician's narrative report), intentionally lied to its insureds, intentionally engaged in cover-up activities in an attempt to "whitewash" its conduct, intentionally committed perjury during the course of discovery connected with the case on the most critical issues involved in the case, and intentionally refused to obtain the nurses' notes during the course of its four reviews of the claim. The majority believes that proof of these facts, if believed by the jury, would authorize the recovery against the insurer of $3.5 million in punitive damages. I do not agree, because I cannot classify the conduct by the insurer's agents in this case to be any more reprehensible than the conduct of the insurer's agent in Vintson.
Admittedly, there was evidence that at the time the insurer initially denied the claim and stated that the claim had been reviewed by a member of the "medical department," that, in fact, it had not been reviewed by a member of the insurer's medical department; admittedly, there was evidence that the Mobile claims representative had stated in a letter to an attorney for the insureds that she had checked with the insurer's "Medical Department," when, in fact, she had only checked with the senior claims representative; admittedly, there was evidence that the senior claims representative, Hutton, had given testimony in a deposition which was in conflict with testimony given by him during the trial of the case; admittedly, there was conflicting evidence regarding the date when the claim was reviewed by the medical department. The insureds contended that the evidence supported a finding that the review by the medical department was on April 28, 1977, the day after the denial of the claim, instead of April 25, 1977, as testified to by a witness for the insurer; and, admittedly, there was conflicting evidence whether the treating physician's narrative report was ever in the insurer's home office file.
Even assuming, however, that each of the insureds' contentions was proven to the reasonable satisfaction of the jury, the crucial issue in this bad faith case, as it is in every bad faith case, is whether the insureds showed that the insurer "had no legal or factual defense to the insurance claim." (Emphasis added.) Vintson, supra. I believe that the insureds failed to meet the burden of proof as required by Vintson. Two of the five doctors testifying at the trial stated that the insurer's actions in denying the claim were reasonable because the charges in question were not shown to be medically "necessary for the treatment of the injury or disease concerned," which was the language of the policy exclusion.
Based on the evidence presented, and applying the law of bad faith as I understand it to be spelled out in Vintson, I can only conclude that the insureds failed to meet their burden of showing that the insurer "had no legal or factual defense to the insurance claim." Vintson, supra.
I realize that the evolution of the tort of bad faith has been difficult, and that the Court has expressed differing views on the standards to be used by the bench and bar in determining when and under what circumstances the tort was established, but in Vintson, this Court clearly established these principles in a succinct and understandable opinion. The principles of law laid down in that decision should be applied in this case; consequently, I must respectfully dissent.
There is an additional reason why the claim for bad faith refusal to pay should not be allowed in this action. The insurer promptly paid a portion of the claim, but denied that portion of the claim which it deemed not covered by the terms of the policy. This partial payment made under the policy, in my opinion, is an additional *1089 fact which precludes a finding of bad faith refusal to pay in this case. Sexton v. Liberty National Life Ins. Co., 405 So.2d 18 (Ala.1981); National Security Fire & Casualty Co. v. Bowen, 417 So.2d 179 (Ala. 1982).
In each of those cases, this Court concluded that, because the insurer had paid a portion of the claim, there was no refusal to pay, and that the insured in each case had failed, therefore, to prove a prima facie case of bad faith refusal to pay. Similarly, in Cincinnati Ins. Co. v. Little, 443 So.2d 891 (Ala.1983), this Court addressed the legal effect of a partial payment when the issue of a bad faith refusal to pay a claim is at issue.
I do not suggest that partial payment by an insurer of a claim would preclude a finding of bad faith refusal to pay in every case; otherwise, an insurer could escape liability for tort, even though the evidence might show that the insured was a victim of an intentional denial of a claim which was not otherwise reasonably debatable;[1] however, in this case, the payment of a "substantial" portion of the claim under the policy is consistent with insurer's claim of good faith denial of the remainder.
Assuming, arguendo, that the insureds did prove their claim for bad faith refusal to pay, I am of the opinion that there is no justification to support an award of punitive damages in the sum of $3,500,000. In Gulf Atlantic Life Ins. Co. v. Barnes, 405 So.2d 916 (Ala.1981), this Court found that a judgment rendered against an insurance company in the amount of $1,100,000 was "excessive and obviously the result of passion and prejudice on the part of the jury." In Barnes, this Court directed the trial court to require a remittitur in the amount of $1,000,000 as a condition to the denial of a new trial.
In Johnson Publishing Co. v. Davis, 271 Ala. 474, 124 So.2d 441 (1960), this Court found a jury verdict awarding plaintiff $67,000 was excessive; there, this Court directed a remittitur of all but $45,000 of the judgment as a condition for affirming the judgment.
Based on the above, I am of the opinion that the verdict of the jury awarding the insureds $3,500,000 is excessive and if the judgment below is to be affirmed, this Court should direct a remittitur.
SHORES, J., concurs.

ON MOTION FOR DISQUALIFICATION AND APPLICATION FOR REHEARING
PER CURIAM.
Pending appellant's application for rehearing, the appellant has filed a motion in this cause styled "Motion for Disqualification and Motion for Withdrawal of Opinion of December 7, 1984, and for Hearing De Novo."
Upon consideration, the Court is of the opinion that under the allegation of said motion in this case each justice should vote individually on the matter of whether or not he or she is disqualified and should recuse. Each justice having voted not to recuse,
IT IS, THEREFORE, ORDERED that the "Motion for Disqualification and Motion for Withdrawal of Opinion of December 7, 1984, and for Hearing De Novo" be, and the same is hereby, denied.
FAULKNER, ALMON, EMBRY, BEATTY, and ADAMS, JJ., concur.
TORBERT, C.J., and MADDOX, JONES, and SHORES, JJ., concur specially, with opinions by TORBERT, C.J., and MADDOX, J.
APPLICATION FOR REHEARING OVERRULED.
*1090 FAULKNER, JONES, ALMON, EMBRY and ADAMS, JJ., concur.
TORBERT, C.J., and MADDOX, SHORES and BEATTY, JJ., dissent.
TORBERT, Chief Justice (concurring specially as to the ruling on the motion for disqualification).
I am in accord with the views expressed herein by Justice Maddox with respect to the issue of whether the Court as a body, or the individual justices, should make the determination as to the disqualification of one or more of its members. I agree on the basis of the American Bar Association standards cited; but more importantly, the alleged disqualification here is more subjective than objective, as would be the case where a judge is related to a party or counsel or where a judge has a direct financial interest in the outcome of litigation. The question of disqualification under the factual assertions of appellant's motion addresses itself to the ethical judicial conscience of each justice applied in accordance with the established rules of law set forth in the opinion by Justice Maddox.
Appellant contends that I am disqualified because, I "may have an interest as a possible class member plaintiff in the circuit court action filed by Justice T. Eric Embry and as such [have] an interest that could be substantially affected by the outcome of this case."
I have stated my opinion in the dissent filed in this case on its original deliverance. Moreover, my views have also been expressed in other similar cases heard before In addition, I have carefully reviewed my file in this matter throughout the time of its consideration before the Court, both upon its original submission on briefs and after that submission was withdrawn and the case was again submitted after oral argument. The filing of actions by a fellow justice against other insurers in no way influenced or affected my consideration of this appeal.
As to the class action aspect of the allegations of appellant's motion, I too, will not allow myself to be included in the alleged class. The circuit court where the action is pending will be so advised.
It is obvious that the Court had great difficulty in the resolution of this appeal. The case was hotly contested in the trial court by able counsel, strongly argued here, and affirmed by a divided Court. It is indeed unfortunate that the litigation has resulted in a serious charge impugning the honesty and integrity of the Court and its members.
MADDOX, Justice (concurring specially as to the ruling on the motion for disqualification).
Aetna's Motion for "Disqualification and Motion for Withdrawal of Opinion of December 7, 1984, and for Hearing De Novo," in pertinent part reads as follows:
"COMES now the Appellant, AETNA LIFE INSURANCE COMPANY, and moves Justice T. Eric Embry to disqualify himself from considering the Appellant's pending application for rehearing, that the remaining Justices of this Court disqualify themselves as Justices considering the appellant's pending application for rehearing, for this Honorable Court to withdraw its opinion of December 7, 1984, which affirmed the verdict of the trial court, for the Clerk of the Supreme Court to certify the disqualifications of the Justices to the Governor of the State of Alabama in accordance with § 12-2-14, Code of Alabama, 1975, and for the special court to hear this case de novo. As grounds for said motion, appellant states as follows:
"1. That on January 19, 1984, after this case was submitted to this Honorable Court for consideration, Justice T. Eric Embry filed an action in the District Court of Jefferson County, Alabama, which is styled as follows, T. Eric Embry v. Maryland Casualty Company, Civil Action No. DV-84-00963, which was dismissed on April 6, 1984....
"2. That on January 30, 1984, after this case was submitted to this Honorable *1091 Court for consideration, Justice T. Eric Embry filed an action in the Circuit Court of Jefferson County, Alabama, which is styled as follows, T. Eric Embry, etc. v. Blue Cross/Blue Shield of Alabama, Civil Action No. CV-84-500-447, and which is still pending in the Jefferson County Circuit Court....
"3. In the Circuit Court of Jefferson County lawsuit against Blue Cross/Blue Shield, Justice T. Eric Embry alleges on behalf of himself and on behalf of a class of all state employees, among other things, that the failure of the defendant insurance company to pay a portion of his medical and hospital claim and delays in the payment of his claim by the defendant insurance company were committed in bad faith. In the District Court of Jefferson County lawsuit, Justice T. Eric Embry, individually, alleged that the defendant insurer in bad faith refused to pay his claim. Both cases demanded the imposition of punitive damages against the respective defendant insurers.
"4. On February 14, 1985 and/or February 15, 1985, the appellant, through its attorneys, was made aware that Justice T. Eric Embry was a party plaintiff in the suits alleging bad faith....
"5. Under the Alabama Canons of Judicial Ethics, Canon 3.C(1)(d)(ii), a Judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned if the Judge has an interest that could be substantially affected by the outcome of the proceeding. Further, the law of Alabama, as set forth in the attached brief, clearly mandates that Justice T. Eric Embry was disqualified from considering and participating in this case and that each Justice of this Court is also disqualified.
"6. Each Justice of this Court participated in the Opinion of December 7, 1984, and may have an interest as a possible class member plaintiff in the Circuit Court action filed by Justice T. Eric Embry and as such has an interest that could be substantially affected by the outcome of this case.

"* * *
"10. Due to the disqualification of Justice T. Eric Embry and all the Justices of this Court, the Court must withdraw its opinion of December 7, 1984, for the Clerk of the Supreme Court to certify these disqualifications to the Governor of the State of Alabama, and for the special court to reconsider de novo this case in its entirety, as required by the Due Process Clause of the Fourteenth Amendment to the Federal Constitution.
"11. The undersigned attorneys are duly and legally admitted to practice law by the Supreme Court of Alabama, are now attorneys in good standing of the Bar of this Court and hereby certify that this motion is filed in good faith and is filed because the undersigned have an obligation to the court as well as to our client. We owe the public a duty to aid the administration of justice, to uphold the dignity of the court and to respect its authority...." (Emphasis added.)
As is apparent from the motion itself, the primary thrust of the motion, particularly paragraph 5, is that Mr. Justice T. Eric Embry is disqualified because of the provisions of Alabama Canons of Judicial Ethics, Canon 3.C(1)(d)(ii). Every other Justice is alleged to be disqualified because "[e]ach Justice of this Court participated in the opinion of December 7, 1984, and may have an interest as a possible class member plaintiff in the Circuit Court action filed by Justice T. Eric Embry and as such has an interest that could be substantially affected by the outcome of this case." Canon 3.C(1)(d)(ii) provides:
"C. Disqualification:
"(1) A judge should disqualify himself in a proceeding in which his disqualification is required by law or his impartiality might reasonably be questioned, including but not limited to instances where:
"* * *

*1092 "(d) He or his spouse, or a person within the fourth degree of relationship to either of them, or the spouse of such a person:
"* * *
"(ii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding."
As I understand the motion, it is directed to me only insofar as I "may have an interest as a possible class member plaintiff in the Circuit Court action filed by Justice T. Eric Embry."
Insofar as I am personally concerned, the movant has failed to show that I am disqualified, but to prevent any question on the matter, I am going to request the clerk of this Court to certify a copy of this special concurrence to the Tenth Judicial Circuit, and to notify the Circuit Court that I do not desire to be a member of any class which has been, or may be, certified in T. Eric Embry, etc. v. Blue Cross/Blue Shield of Alabama, Civil Action No. CV-84-500-447.
Recusal is required only where "facts are shown which make it reasonable for members of the public, or a party, or counsel opposed to question the impartiality of the judge." Acromag-Viking v. Blalock, 420 So.2d 60, 61 (Ala.1982).
Recusal is not required by a mere allegation of bias unsupported by substantial fact. Acromag-Viking v. Blalock, supra. Because I have no personal interest in the action filed by Mr. Justice Embry, I am not disqualified. I have no personal bias against the movant or any other party to the litigation, although my views on the law relative to "bad faith" actions is set out not only in my dissent in this case, but in others also.
By writing this special concurrence, I should not be understood as expressing an opinion on the question of whether any other member of this Court should or should not be disqualified, because I believe that the question of recusal of an appellate judge can be decided better by the judge himself.[1] My view comports with the American Bar Association Standards Relating to Appellate Courts, Section 3.42, which provides:
"3.42 Disqualification of Judges. A judge of an appellate court should be subject to disqualification on the grounds set forth in the Code of Judicial Conduct recommended by the American Bar Association, and in any case in which the judgment under review is one by a court in whose decision he participated as a judge in a lower court.
"Commentary
"An appellate judge should be subject to challenge for cause on the same grounds as a trial judge, and also when an appeal involves a review of his own decision. The most difficult problem concerns the procedure to be employed. As in the challenge of a trial judge, if the challenge is sufficient on its face and any reasonable doubt of the judge's disinterestedness is suggested, the judge may be expected to disqualify himself. If he does not do so, in the case of a trial judge factual issues relating to disqualification should properly be determined by another judge. See § 2.32, Standards Relating to Trial Courts. In the case of an appellate judge, however, that procedure would subject the judge to decision of his disinterestedness by official peers with whom he may continue to serve in a collegial capacity in deciding the case. Moreover, because an appellate court decides questions of law rather than fact, the question of an appellate judge's `bias' is often practically indistinguishable from the question of his views on the law, which are not properly subject to disputation through the recusal procedure. Given these complications, it is better that the question of recusal be decided by the judge himself. If he is a judge of an intermediate appellate court, *1093 there remains the remedy of appeal from a decision in which he participates; if he is a judge of a supreme court, reliance must be placed on his recognition that a court should not only be disinterested but that it should appear to be so.
"In some jurisdictions, peremptory challenge of a trial judge is permitted. See Commentary to § 2.32(b), Standards Relating to Trial Courts. This procedure is inappropriate in the case of an appellate judge. In the collegial decision-making of an appellate court an individual judge's purely personal views are of less significance than they would be in a trial court and he is subject to collegial restraint should he be inclined to act on them; an appellate judge has few occasions for exercising the broad discretion reposing in a trial judge; and in appellate litigation there is no occasion for the intense personal interaction between the judge and the lawyers and litigants that may occur in a trial court. Moreover, an appellate judge's established views on law and justice, at least up to a point, are a proper element of the contribution he makes to the function of an appellate court, particularly in the development of the law. A peremptory challenge might easily be abused to exclude a judge solely because a litigant disagreed with his views."
See, also State ex rel. Wild v. Otis, 257 N.W.2d 361 (Minn.1977); contra: State ex rel. Short, Atty. Gen., v. Martin, 125 Okl. 24, 256 P. 681 (1927) (Supreme Court has power to disqualify any one or more of its members from participating in a case).
In determining that I am not disqualified, I have applied the following test, set out in Ex parte Cornwell, 144 Ala. 497, 498-99, 39 So. 354 (1905):
"It is true that the respondent has no direct, pecuniary interest in the result of the prosecution by the State against the petitioner on the pending indictments. And, if the question of disqualification were left to be determined alone by the terms of the statute, § 2637 of the Code, under the facts in the present case, no disqualification could be said to exist. But, under the common law, there are other grounds than those mentioned in the statute, which go to the disqualification of the judge.
"In Gill v. State, 61 Ala. [169] 172, it was said, `According to the stern morality of the common law, a judge is required to be legally indifferent between the parties.' In Freeman on Judgments, § 145, it is said to be `Well settled by the common law that no judge ought to act where, from interest or any other cause, he is supposed to be partial to one of the suitors.' Any interest, the probable and natural tendency of which is to create a bias in the mind of the judge for or against a party to the suit, is sufficient to disqualify. The judge is human, and human nature at best is weak, and as far as it is possible a perfect equipoise should always be preserved in the administration of justice by the courts. Pecuniary interest in the result of the suit is not the only disqualifying interest. If such were true, there would exist no disqualification in the judge to try a defendant on a charge of arson in the burning of the house of the judge. And yet no one would for a moment question the existence of such an interest in the result of the trial, the probable and natural tendency of which would be to create a bias, that would affect the competency of the judge."
Based on the foregoing, I am of the opinion that it is better that the question of recusal of an appellate judge be decided by the judge himself, and I have determined that the movant has failed to show that I should disqualify myself in this case; therefore, I am of the opinion that the movant's request is due to be denied.
NOTES
[1] The decisions in Prudential Ins. Co. v. Coleman, 428 So.2d 593 (Ala.1983), Dutton, and Vintson illustrate that it is the existence or non-existence of the debatable reason that is critical and that once that is established questions of whether the claim was properly investigated and evaluated are essentially moot.
[2] While there is controversy concerning exactly what materials were in the Lavoie file when reviewed by Dr. Swan, the expert evidence offered at trial was to the effect that even if everything available to Aetna was in the file there was still a debatable question as to whether all procedures were medically necessary.
[1] Cf. Berry v. United of Omaha, 719 F.2d 1127 (11th Cir.1983) (applying Alabama law; full payment of claim prior to suit is not a defense if the initial refusal to pay was made in bad faith). See also Blan, The Tort of Bad FaithA Defense Viewpoint, 34 Ala.L.Rev. 543 (1983), Heninger, Bad Faith in Alabama: An Infant Tort in Intensive Care, 34 Ala.L.Rev. 463 (1983).
[1] In Duncan v. Johnson, 338 So.2d 1243 (Ala. 1976), I recused myself because a justice had represented one of the parties to the litigation. See also, Simpson v. City of Montgomery, 282 Ala. 368, 211 So.2d 498 (1968).