**LAMPLITER DINNER THEATER, INC., an Alabama Corporation doing business in Montgomery County, Alabama, Plaintiff-Appellant, Cross-Appellee,**

v.

**LIBERTY MUTUAL INSURANCE CO. and Liberty Mutual Fire Insurance Co., Defendants-Appellees, Cross-Appellants.**

No. 85–7400.

United States Court of Appeals,
Eleventh Circuit.

June 30, 1986.

J. Richard Piel, Piel & Lynn, Montgomery, Ala., for plaintiff-appellant, cross-appellee.

John F. Whitaker, Sadler, Sullivan, Sharp & Stutts, Charles E. Sharp, Birmingham, Ala., William I. Hill, II, Montgomery, Ala., for defendants-appellees, cross-appellants.

Before KRAVITCH and HATCHETT, Circuit Judges, and MORGAN, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

In an interlocutory appeal and cross-appeal by the Lampliter Dinner Theater (Lampliter) and the Liberty Mutual Insurance Company (Liberty), Lampliter, plaintiff below, appeals the district court's dismissal of ten counts of a twelve count complaint. Lampliter also appeals the dismissal of L.K. Mocabee as an individual plaintiff. Liberty cross-appeals and claims that the remaining two counts of Lampliter's complaint also should have been dismissed. We conclude that the district court's actions were correct and remand for further proceedings on Lampliter's two remaining claims.

## I. BACKGROUND

On February 20, 1983, two teenage boys, Andrew Hickman and Joel Bass, died in an automobile accident after imbibing alcoholic beverages at the Lampliter. On May 18, 1983, Hickman's father filed a complaint in state court, as did Bass' parents on June 21, 1983, alleging wrongful death due to Lampliter's serving alcoholic beverages to minors in violation of state law. At the time of the accident, Lampliter maintained an insurance policy which it had purchased from Liberty Mutual in 1981. Lampliter notified Liberty of the initial suit on May 20, 1983. On May 25, 1983, Lampliter purchased from Liberty Mutual additional coverage consisting of liquor liability coverage insurance. On June 9, 1983, Lampliter submitted a letter to Liberty that was signed by Rick Sharples, a former employee of Liberty who had sold Lampliter coverage in 1978. Sharples' letter states that he and Lampliter had intended that the 1978 policy cover liability resulting from the sale of alcoholic beverages. Lampliter contends that Sharples told it that the policy would cover such liability. Sharples, however, did not sell Lampliter the 1981 policy in effect at the time of the accident. That policy was sold to Lampliter by Charles Wells, who stated in deposition that he offered Lampliter liquor liability coverage which Lampliter declined.

Liberty reviewed Lampliter's claim at its home office in Massachusetts and denied coverage on June 27, 1983. Liberty relied on the following two clauses from the Lampliter insurance policy. First, exclusion (h) provides that the policy shall not apply "to bodily injury or property damage for which the insured or his indemnitee may be liable (1) as a person or organization engaged in the business of manufacturing, distributing, selling, or serving alcoholic beverages." Second, the scope of exclusion (h) is limited solely by the following clause:

IV. HOST LIQUOR LAW LIABILITY COVERAGE. Exclusion (h) does not apply with respect to liability of the insured or his indemnitee arising out of the giving or serving of alcoholic beverages at functions incidental to the named insured's business, provided the named insured is not engaged in the business of manufacturing, distributing, selling or serving alcoholic beverages.

At the time of the accident, Lampliter had a liquor license and a substantial amount of its income was derived from the sale of alcoholic beverages. Accordingly, Liberty determined that Lampliter's policy did not cover Lampliter's liability for liquor related injuries.

The Hickman and Bass wrongful death cases went to trial against Lampliter and resulted in jury awards totaling ten million dollars. On June 21, 1984, after the jury awards, Lampliter filed this action in state court against Liberty. Shortly thereafter Liberty removed the case to federal court and filed a third party complaint against the Hickman and Bass parents seeking declaratory judgment that the policy it had provided Lampliter did not cover the jury verdicts.

In August, 1984, Lampliter amended its complaint to add, as party plaintiff, L.K. Mocabee who was president and chief

stockholder of Lampliter, owner of the property on which the Lampliter was located, and a named insured in the Liberty policy. Four subsequent amendments to the complaint brought the total of counts to twelve.[1] The district court issued an opinion on January 15, 1985, dismissing all claims except for counts I, II, and III as to Lampliter, and count I as to Mocabee.

On February 8, 1985, the court dismissed the Hickman and Bass parents as third party defendants and granted their motion to intervene as party plaintiffs. The parents' motion was accompanied by a document signed by Lampliter and Mocabee, which states that they and the parents "feel that Liberty Mutual is responsible for the jury verdicts" and that Lampliter assigns to the parents all rights and claims against Liberty Mutual up to the amount of the verdicts. In consideration for the assignment, the parents agreed not to enforce the state judgment against Lampliter. Lampliter and Mocabee, however, "specifically reserve[d] their claims against Liberty Mutual arising from damages suffered in excess of the jury verdicts as alleged in [the instant action] including, but not limited to, attorneys' fees, damage to business reputation, lost profits and punitive damages."

On March 1, 1985, the court reconsidered its January 15th order and struck all counts except counts VI and X, and dismissed Mocabee as a party plaintiff.[2] Liberty subsequently settled the Hickman and Bass claims for $225,000 each and on March 26, 1985, the parents' claims were dismissed with prejudice pursuant to a joint

1. In these twelve counts plaintiffs allege the following:

I. Liberty breached its insurance contract by wrongfully denying coverage and refusing to defend the Hickman and Bass suits brought against Lampliter;

II. Liberty exhibited bad faith in refusing to defend, negotiate, or settle the Hickman and Bass lawsuits;

III. Liberty's agent made fraudulent oral representations regarding the scope of Lampliter's insurance contract;

IV. Liberty breached its duty to defend Lampliter against the Hickman and Bass suits based on Lampliter's reasonable expectations;

V. Liberty's denial of coverage and refusal to defend amounted to outrageous conduct;

VI. Liberty breached the oral agreement made by its agent Sharples to provide adequate insurance to Lampliter;

VII. Liberty breached the insurance contract as to Mocabee because of its bad faith in refusing to defend the Hickman and Bass lawsuits;

VIII. Liberty misled Lampliter as to the scope of its insurance policy when it renewed the policy in 1981;

IX. Liberty perpetrated a fraud on Lampliter by knowingly misrepresenting the scope of its insurance policy;

X. Liberty drafted and issued a policy that failed to express the intent of the parties and therefore the contract should be reformed to reflect the parties' true intentions;

XI. Liberty breached an oral contract describing Lampliter's coverage entered into by Sharples at the time the contract was renewed; and

XII. Liberty perpetratēd a fraud on Lampliter by failing to disclose the actual scope of the coverage it had sold to Lampliter.

2. The court struck Lampliter's counts IV, VIII and XI as redundant. Lampliter does not challenge this determination, but contends that the court erred by granting Liberty summary judgment on these claims. We note, however, that summary judgment was not granted on these claims. The district court determined that counts IV, VI, VIII, and XI were based on an alleged oral agreement to provide insurance and best stated in count VI which was a viable claim. Accordingly, we will address Lampliter's arguments advancing claims IV, VIII, and XI in our consideration of the court's disposition of count VI.

Lampliter also contends that the district court erred by granting Liberty summary judgment on count V. Beyond making this assertion in a point heading, Lampliter does not pursue this contention. Again we point out that the district court did not grant summary judgment on this claim. It struck count V because Lampliter, as a corporate entity, could not maintain an action for outrageous conduct. The tort of outrageous conduct, recently recognized in Alabama, is also known as the intentional infliction of emotional distress. See American Rd. Serv. Co. v. Inmon, 394 So.2d 361 (Ala.1980). We agree with the district court that corporations cannot experience emotional distress and cannot therefore maintain a suit for outrageous conduct. Although this count was dismissed for failure to state an actionable claim, it does not appear that the court went beyond the pleadings to reach this conclusion. Therefore dismissal of this count did not amount to summary judgment. See Fed.R.Civ.P. 12(b)(6).

stipulation between them and Liberty Mutual. Liberty then moved the court to dismiss the entire case, arguing that Lampliter had assigned all its claims to the parents, or in the alternative that the case should be tried and Liberty held responsible only to the extent that a judgment exceeded the ten million dollar verdicts. By order of April 18, 1985, the court opined that Lampliter had not assigned the parents its claims for attorneys' fees, damage to business reputation, lost profits, or punitive damages. The court struck the claim for punitive damages, however, holding that the unassigned claims, which arose out of an oral agreement and sought an equitable reformation of the insurance policy, could not support such a claim. The court further authorized this interlocutory appeal of any of its orders by either party.

## II. ANALYSIS

### A. *Breach of Written Contract*

◼ Lampliter argues that the district court erred in dismissing count I of the complaint. That count alleged that Liberty had breached the terms of its written insurance contract with Lampliter by wrongfully denying coverage and refusing to defend Lampliter in the Hickman and Bass suits. The district court determined that the terms of the insurance contract were not ambiguous; as written, the policy did not cover Lampliter's liquor liability and therefore Liberty was not liable for breaching the explicit terms of the agreement. *See Turner v. United States Fidelity & Guaranty Co.*, 440 So.2d 1026 (Ala.1983) (where insurance contract is unambiguous, contract must be enforced as written).

Lampliter argues that its policy was ambiguous as to whether it provided liability for liquor related injuries. All parties agree that the relevant portions are Exclusion (h) and the Host Liquor Law Liability Coverage clause. Exclusion (h) expressly states that the policy does not cover injuries where the insured's liability is predicated on its status as a business engaged in selling or serving alcoholic beverages. The Host Liquor Law Liability clause states

that exclusion (h) does not deny coverage where an insured's liability arises from serving alcohol at a function incidental to its business provided that the insured is not regularly engaged in the business of selling liquor. Lampliter cannot credibly argue that it was not in the business of selling and serving alcohol: it held a liquor license and in 1983, the year of the accident, approximately fifteen per cent ($90,000) of its sales revenue was from the sale of liquor.

Lampliter does not specify which sections of the contract are ambiguous. It argues instead that its breach of written contract claim should have been tried because there is a dispute as to how Exclusion (h) and the Host Liability clause should be interpreted. Lampliter correctly points out that ambiguous language in insurance contracts must be construed in favor of the insured, *Turner, supra*, and that ambiguity is shown where language would appear ambiguous to the average person. *Smith v. Horace Mann Insurance Co.*, 713 F.2d 674 (11th Cir.1983) (per curiam). Lampliter contends that it has shown ambiguity because both it and Sharples, the Liberty agent who sold Lampliter its original policy, believed the policy covered liquor liability. Liberty counters that Sharples' understanding of the 1978 policy is immaterial to the interpretation of the 1981 policy at issue here. Liberty also cites several state court cases that have held that Exclusion (h) and the Host Liability clause (or its analogs used by other companies) are not ambiguous. *See Heritage Insurance Co. v. Cilano*, 433 So.2d 1334 (Fla.Dist.Ct.App.1983); *Morrison v. Miller*, 452 So.2d 390 (La.Ct.App.1984); *New Hampshire Insurance Co. v. Hillwinds Inn, Inc.*, 117 N.H. 350, 373 A.2d 354 (1977).

At oral argument, Lampliter asserted that *Kelmo Enterprises, Inc. v. Commercial Union Insurance Co.*, 285 Pa.Super. 13, 426 A.2d 680 (1981) had resolved ambiguity in an analogous Exclusion (h) in favor of an insured. Were Exclusion (h) inherently ambiguous, dismissal would have

been inappropriate. *Kelmo*, however, held that "regardless of the clarity or ambiguity of policy language," an insurance company had to demonstrate that its insured understood a policy exclusion before the insurer could rely on the exclusion to deny a duty to defend its policyholder. 426 A.2d at 682–83. Therefore, Lampliter's contention, based on *Darner Motor Sales Inc. v. Universal Underwriters Insurance Co.*, 140 Ariz. 383, 682 P.2d 388 (1984) (ambiguity is established where different jurisdictions reach conflicting interpretations of an insurance clause) is wholly inapplicable here. We also note that the *Kelmo* requirement that an insurer prove its insured's understanding of an exclusion is apparently not a requirement for invoking an exclusion clause in Alabama. *See Turner, supra.* Indeed, *Kelmo Enterprises* is of questionable precedential value in Pennsylvania. *See Standard Venetian Blind Co. v. American Empire Insurance Co.*, 503 Pa. 300, 469 A.2d 563 (1983) (disapproving *Kelmo Enterprises*); *Bishop v. Washington*, 331 Pa.Super. 387, 480 A.2d 1088 (1984) (en banc) (disagreeing with rationale of *Kelmo Enterprises*).

In light of the fact that Lampliter was in the business of selling liquor, and the plain language of Exclusion (h) and the Host Liability clause, we conclude that the district court correctly dismissed Lampliter's first claim: the clauses simply are not ambiguous. *Accord, Billups v. Alabama Farm Bureau Mutual Casualty Insurance Co.*, 352 So.2d 1097, 1102 (Ala.1977) ("Ambiguities will not be inserted, by strained and twisted reasoning, into contracts where no such ambiguities exist."). Moreover, Lampliter's contentions that Liberty's agents and Lampliter intended that the policy cover liquor liability go to whether Liberty breached an oral agreement with Lampliter, not to whether the terms of the written policy are ambiguous.

B. *Bad Faith Refusal to Provide Coverage*

■ The district court struck Lampliter's claim that Liberty had exhibited bad faith by refusing to defend Lampliter in the Hickman and Bass suits. The court applied *Chavers v. National Security Fire & Casualty Co.*, 405 So.2d 1, 7 (Ala.1981), which held that an insurer's bad faith refusal to settle a claim is made out where (1) the insurer actually knows there is no lawful basis for refusing to settle a claim, *or* (2) the insurer intentionally fails to determine whether there is a lawful basis for refusal. *See generally,* Comment, *Reviewing the Practicality of Alabama's Tort of Bad Faith,* 16 Cum.L.Rev. 329 (1986). The district court determined that because the written Liberty contract clearly did not provide coverage, there was a lawful basis for refusal.

Lampliter argues that Liberty failed to properly investigate whether it had a legal basis to deny coverage. Specifically, Lampliter contends that Liberty, in denying coverage, recklessly ignored Sharples' sworn statements that he had intended to sell Lampliter liquor liability coverage. Moreover, Lampliter claims that Liberty further evidenced its bad faith by eventually settling Hickman and Bass parents' claims.

Initially, we note that the burden in a bad faith denial of coverage claim is squarely upon the insured to show that "the insurance company had no legal or factual defense to the insurance claim." *National Security Fire & Casualty Co. v. Vintson,* 454 So.2d 942, 944 (Ala.1984). Because we have determined that the policy, on its face, excluded liquor liability coverage, it necessarily follows that Liberty had plausible arguments for denying coverage and Lampliter's bad faith claim must fail. Indeed, this case is similar to *Vintson* in which the Alabama Supreme Court denied a bad faith claim. As in *Vintson,* Lampliter contends that it relied on the oral misrepresentations of an insurance agent regarding the scope of the coverage it purchased. The *Vintson* plaintiff was allegedly misled as to the effective date of coverage, whereas Lampliter argues it was misled as to coverage for specific liability. In both cases, however, the clear language of the agreements contradicts the alleged

oral representations. Accordingly, as in *Vintson,* the contradiction between the written terms and alleged parol representations provides a debatable question as to the scope of coverage sufficient to defeat allegations of bad faith. *See id.* at 945.

Lampliter's focus on Sharples' statements to Liberty is misplaced. All that is required is a reasonable basis for denying coverage. Sharples' statements that he thought Lampliter was covered are immaterial unless Liberty recklessly ignored these claims by failing to investigate them. Lampliter relies on *Aetna Life Insurance Co. v. Lavoie,* 470 So.2d 1060 (Ala.1984), but does little more than quote *Lavoie* for three pages in its brief and assert that its case is on all fours with *Lavoie* because in both instances the insurer continued to investigate its obligations in order to create a factual dispute over coverage. *See id.* at 1072. We note that the *Lavoie* decision, vacated in — U.S. —, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986), is a nullity. Moreover, even if *Lavoie* were good law, the present case is very different. In *Lavoie,* the insurer recklessly ignored medical records it normally would have relied on to assess the validity of a claim and intentionally deceived its insureds as to its investigation. *Lavoie,* 470 So.2d at 1067–70. The Alabama Supreme Court emphasized that the bad faith denial of coverage must be evaluated on the circumstances that existed at the time coverage was denied and cautioned that an insurer may not defeat a bad faith claim by manufacturing a plausible basis for its actions after it has denied coverage. *Id.* at 1071–72. Here, Liberty is accused of continuing its investigation regarding coverage although an ex-employee who had not sold the policy at issue swore he thought Lampliter was covered. Thus Lampliter argues that Liberty's investigation of its claim was nothing more than an attempt to create a plausible basis for denying coverage. Under these circumstances, however, Liberty's actions were not taken in bad faith; indeed Liberty would have been reckless had it relied solely on Sharples' initial impressions.

■ Finally, Lampliter's argument that Liberty demonstrated its bad faith by eventually settling the Hickman and Bass suits is wholly improper. Well established case law and the Federal Rules of Evidence prohibit the introduction of settlements or settlement negotiations into evidence to prove liability. Fed.R.Evid. 408; *see Dallis v. Aetna Life Insurance Co.,* 768 F.2d 1303 (11th Cir.1985). Lampliter attempts to do exactly what Fed.R.Evid. 408 proscribes by arguing that the settlement indicates that Liberty realized it was liable for the claims upon which Lampliter asserted coverage. Even if it were not against public policy to consider a settlement offer as evidence of liability, an eventual settlement does not indicate that an initial denial of coverage was in bad faith. Again, Lampliter has simply missed the point: bad faith is made out by the total absence of reasonable grounds to deny coverage. An eventual settlement has nothing to do with whether there were reasonable grounds to deny coverage initially.

## C. *Statute of Limitations Bar to Fraud Claims*

■ Counts III, IX and XI of the Lampliter complaint alleged essentially the same claim: Liberty defrauded Lampliter as to the scope of its coverage. The district court dismissed these claims as barred by Alabama's statute of limitations. For the purpose of reviewing the district court's dismissal, we assume that Liberty defrauded Lampliter.

The applicable Alabama statute of limitations for fraud provided one year within which to commence an action.[3] Ala.Code § 6–2–3, however, operates as a "saving clause" by tolling the limitations period in fraud cases until the fraud is discovered.[4]

---

3. Ala.Code 1975 § 6–2–39.

4. Lampliter points out that Ala.Code § 6–2–3 was amended to provide a two year limitations period for fraud claims. The effective date of the amendment is January 9, 1985—nearly six months after Lampliter filed its action. Nothing in the statute suggests that the amendment should be applied retroactively. Moreover, the

Ala.Code § 6–2–3 does not require actual notice of fraud, the limitations period commences once the fraud is readily discoverable or the potential plaintiff is on notice that a fraud may have been perpetrated. *Johnson v. Shenandoah Life Insurance Co.*, 291 Ala. 389, 281 So.2d 636, 642–43 (1973). Facts that would provoke a reasonable person's inquiry and lead to a discovery of the fraud commence the limitations period. *Butler v. Guaranty Savings & Loan Ass'n*, 251 Ala. 449, 37 So.2d 638 (1948).

Lampliter filed this complaint on June 21, 1984 and argues that its complaint is timely because fraud was not discoverable until June 27, 1983—the date Liberty denied coverage. Based on uncontroverted evidence, the district court found that Lampliter purchased liquor liability insurance from Liberty on May 25, 1983—one week after the Hickman suit was filed in state court.[5] The district court concluded as a matter of law, therefore, that a reasonable person would have discovered the alleged fraud on May 25, 1983. Quite simply, on that date Lampliter should have realized that it did not have the coverage that Liberty had allegedly misled it into believing it had. Accordingly, the district court determined that Lampliter's suit was barred because it was filed more than a year after Lampliter should have been aware that it had been defrauded.

Lampliter argues that the fraud was not discoverable until June 27, 1983, when Liberty issued its letter denying coverage. Lampliter asserts that Liberty's interim communications that it was getting a legal opinion and its request to the Hickman and Bass courts for an extension of time in which to file a complaint, reasonably lulled Lampliter into believing there was coverage. This argument, however, is undermined by the Alabama Supreme Court's recent decision in *Moore v. National Security Insurance Co.*, 477 So.2d 346 (Ala. 1985). There, plaintiffs could not skirt a statute of limitations bar to their fraud action by arguing that the defendant insurance company was estopped from raising a limitations defense because it had assured the plaintiffs that it was investigating their claim. *Moore* reaffirmed that whether "a statute has run is a question more properly directed to the plaintiffs' diligence and not to the defendants'." *Id.* at 348 (quoting *Page v. Hale*, 472 So.2d 634 (Ala.1985)). The burden was squarely on Lampliter to prove that it was unaware of facts that would lead a reasonable person to suspect fraud. *Walker v. American Motorists Insurance Co.*, 529 F.2d 1163, 1165 (5th Cir. 1976) (citing Alabama case law).[6] Lampliter does not present any material question of fact as to whether, on May 25, 1983, it bought coverage it thought it already had.

The dictates of *Johnson; Butler; Moore;* and *Page* are clear. The limitations period commenced once Lampliter was on notice that it may have been defrauded and was not tolled by Liberty's investigation into the merits of Lampliter's claim. Lampliter knew or should have known that on May 25, 1983, when it purchased liquor liability coverage, that any previous representations that it had liquor liability coverage were fraudulent. As in *Walker*, summary judgment was appropriate because Lampliter brought forth no evidence that it could not have been aware of Liberty's fraud

Alabama courts have not applied the amendment retroactively, instead they apply the law in effect at the time the suit arose. *See, e.g., Schoen v. Gulledge*, 481 So.2d 1094, 1097 (Ala. 1985). Because we conclude that Lampliter's fraud claim was time barred when Lampliter brought its suit, we also conclude that Lampliter's fraud claims expired before they could receive the benefit of the 1985 amendment.

**5.** Lampliter argues that it purchased the liquor liability coverage because a Liberty agent indicated that would expedite Liberty's decision to

defend Lampliter. Why Lampliter bought the coverage is irrelevant; the question is whether a reasonable person would have suspected fraud if he were required to purchase coverage he thought he already had.

**6.** The Eleventh Circuit, in the en banc decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

before Liberty denied coverage.[7] Lampliter's June 21, 1984 action was untimely.

### D. *Assignment*

■ On March 1, 1985, the district court determined that Lampliter had viable claims for breach of oral contract to procure requested insurance (count VI) and for reformation of the written contract to reflect the parties' intentions (count X). Shortly thereafter Liberty entered into a settlement agreement with the Hickman and Bass parents. In exchange for $250,-000 the parents released all of their claims against Liberty. Liberty and the parents filed a joint motion for dismissal which was granted on March 25, 1985. Liberty subsequently filed a motion for summary judgment against Lampliter on the grounds that Lampliter had previously assigned all of its claims against Liberty to the Hickman and Bass parents in exchange for their promise not to enforce their ten million dollar state judgment against Lampliter. Liberty alternatively argued that Lampliter's case should be tried as though there had been no assignment and recovery should be limited to the amount of damages in excess of the ten million dollar state verdict the parents agreed to forego.

The district court examined the Lampliter assignment and noted that, although ambiguous, the assignment appeared to transfer to the parents Lampliter's claim against Liberty for the ten million dollar verdict. The court observed that Lampliter apparently "intended to retain that part of its claim against Liberty which it was not already obligated to pay over to the [p]arents."[8] The district court further noted that its denial of Liberty's summary judg-

ment motion involved controlling questions of law as to which there were substantial grounds for difference of opinion and authorized an interlocutory appeal.

Initially, we note that the controlling question of law here is well settled. When considering a motion for summary judgment, a court must resolve all factual questions in favor of the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Borg-Warner Leasing v. Doyle Electric Co.*, 733 F.2d 833 (11th Cir.1984). Here, the court observed that Lampliter's assignment, although ambiguous, appeared to retain some of its claims against Liberty. Hence, the court properly denied Liberty's motion because it resolved the ambiguities of the assignment in favor of the party opposing summary judgment, Lampliter.

While the controlling question of law here is clear, the controlling question of fact is not. Liberty emphasizes that the agreement states that "Lampliter hereby assigns to Parents all rights and claims against Liberty Mutual whether in contract or tort ... including, but not limited to, claims existing by reason of the negligence, fraud or bad faith of said insurer up to an amount equal to the jury verdicts in the Parents' [state court judgments]." This language does indeed suggest that there is nothing left for Lampliter to litigate now that the parents have settled. Lampliter, however, points to a subsequent paragraph of the agreement that states: "Lampliter and Mocabee do not assign but specifically reserve their claims against Liberty Mutual arising from damages suffered in excess of

---

7. We construe the district court's dismissal of these claims as a grant of summary judgment. Liberty moved for summary judgment on the grounds that Lampliter's fraud claims were untimely, and, in disposing of these claims the district court considered testimony beyond the pleadings (i.e.—the date Lampliter purchased liquor liability coverage). *See* Fed.R.Civ. P. 12(b)(6).

8. These claims were for attorneys' fees, damage to business reputation, lost profits and punitive damages. Lampliter argues that the court im-

properly read its assignment as transferring its fraud claims to the parents. We need not address this argument because we have already concluded that this claim is time barred. Lampliter also argues that its claim for punitive damages was improperly struck. We disagree. Having concluded that Lampliter's fraud and bad faith claims were properly dismissed, Lampliter is left with contract claims which do not give rise to actions for punitive damages. *See Hood v. Prudential Ins. Co.*, 460 So.2d 1227, 1232 (Ala.1984).

jury verdicts as alleged in [the parents state suit against Lampliter] including, but not limited to, attorneys' fees, damage to business reputation, lost profits and punitive damages." There is thus sufficient ambiguity in the agreement to defeat Liberty's summary judgment motion.

It is unclear whether the court entered a finding of fact that Lampliter had not assigned its contract claims to the parents. Such a finding was not necessary to the court's disposition of Liberty's summary judgment motion. The court noted that the agreement was ambiguous and stated that it was "of the opinion that Lampliter did not assign ... its claims [arising from an oral contract]." If indeed the court has made such a finding, we would not reverse unless it were clearly erroneous. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) (trial court finding based solely on documentary evidence must be upheld unless clearly erroneous). Lampliter's inartfully drawn assignment is susceptible to two conflicting readings and "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* Our review of interlocutory orders is discretionary, however, and we therefore decline to review at this time the district court's determination that Lampliter had not assigned its contract claims to the Bass and Hickman parents. Such a review would best be accomplished upon a complete trial record. We conclude, therefore, only that Lampliter has withstood Liberty's motion for summary judgment.

### E. Dismissal of Mocabee as Party Plaintiff

█ Pursuant to Fed.R.Civ.P. 21, the district court sua sponte dropped Mocabee from this suit observing that because he

was not a named party in the Hickman and Bass lawsuits, no state judgments were awarded against him. Therefore, he was not damaged by Liberty's alleged breach of contract. The court also construed Mocabee's damage claims for lost business as stockholder claims subsumed in Lampliter's prosecution of this case.

Mocabee argues that he was improperly dropped because he is a named insured in both the 1978 and 1981 policies, he is the principal stockholder in Lampliter, and owned the business premises that Lampliter leased. He contends that he has been damaged the most by Liberty's alleged breach. He argues that whether Liberty's breach was the proximate cause of his injuries and the extent of those injuries are questions for a trier of fact.[9]

█ Rule 21 provides that a court may drop a party "on its own initiative at any stage of the action and on such terms as are just." Dropping or adding a party to a lawsuit pursuant to Rule 21 is left to the sound discretion of the trial court. *See Williams v. Hoyt*, 556 F.2d 1336, 1341 (5th Cir.1977), *cert. denied*, 435 U.S. 946, 98 S.Ct. 1530, 55 L.Ed.2d 544 (1978). Accordingly, the decision to drop Mocabee as a party to this suit will only be reversed if it constitutes an abuse of discretion. *See Anderson v. Moorer*, 372 F.2d 747, 750 n. 4 (5th Cir.1967). Mocabee does not argue that the district court's decision to drop him from this suit is an abuse of discretion; instead he claims it is a clearly erroneous factual determination. We note that no factual determination as to the propriety of Mocabee's claims has been made, Rule 21 primarily addresses parties, not factfinding. Nothing in the court's order prevents Mocabee from pursuing his individual claims in a separate suit.[10] Because trial

---

9. Liberty did not address this claim in its brief or at oral argument.

10. Although a Rule 21 motion to drop a party may be recast as a Fed.R.Civ.P. 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted, *Undergraduate Student Ass'n v. Peltason*, 359 F.Supp. 320, 322

(N.D.Ill.1973) (three judge court), we do not construe dropping Mocabee from this suit as such a dismissal. Were we to recast the court's order as a 12(b)(6) dismissal, Mocabee would be barred from relitigating these claims. Where a 12(b)(6) dismissal is raised by a defendant and, as here, materials beyond the pleadings are considered, the dismissal motion is treated as one

courts are afforded great discretion in managing their dockets, we conclude that the court did not abuse its discretion in dropping Mocabee as a plaintiff in this suit.

## III. CONCLUSION

In light of the foregoing we AFFIRM the district court's orders dismissing all counts, other than counts VI and X, of the Lampliter complaint and dropping Mocabee as a party. Accordingly, we REMAND for further proceedings on the viable counts.

for summary judgment and the plaintiff is afforded the right to respond to the motion. It is well settled that a court's sua sponte grant of summary judgment must be preceded by 10 days notice. *Herron v. Beck,* 693 F.2d 125, 127 (11th Cir.1982). It would be inequitable to dismiss Mocabee with attendant res judicata effect on the court's sua sponte invocation of Rule 21.

It is possible that Mocabee's individual complaint will be dismissed because it fails to state a claim under any set of facts consistent with his allegations. *See Hishon v. King & Spalding,*

467 U.S. 69, 104 S.Ct. 2229, 2233, 81 L.Ed.2d 59 (1984). Indeed, numerous circuits have held that a trial court may dismiss a complaint on its own motion for failure to state a claim. *Shawnee Int'l, N.V. v. Hondo Drilling Co.,* 742 F.2d 234, 236 (5th Cir.1984) (citing cases). At this juncture, Mocabee has been dropped pursuant to Rule 21. That rule focuses on parties, not claims, and we therefore decline to address the merits of Mocabee's individual claims at this point.